2006 OK 34

**JACOBS RANCH, L.L.C., an Oklahoma limited liability company, Roos Ranch, Inc., an Oklahoma corporation, and Roos Resources, Inc., an Oklahoma corporation, Plaintiffs/Appellants,**

v.

**Duane A. SMITH, as Executive Director, and the Oklahoma Water Resources Board, an agency of the State Of Oklahoma, Defendants/Appellees,**

**and**

**Arbuckle Master Conservancy District, the City of Ardmore, The City of Davis, the City of Durant, the City of Sulphur, the City of Tishomingo, the City of Wynnewood, The City of Ada, and Gary Green, Earl Brewer, John Bruno, and Reginald Easterling, as members of the Citizens for the Preservation of the Arbuckle–Simpson Aquifer, Intervenors/Appellees.**

No. 101,727.

Supreme Court of Oklahoma.

May 23, 2006.

As Corrected on Denial of Rehearing
Nov. 6, 2006.

---

Clyde A. Muchmore, Mark S. Grossman, Crowe & Dunlevy, Oklahoma City, OK, for plaintiffs/appellants.

Dean A. Couch, Oklahoma City, OK, for defendants/appellees, Duane A. Smith and Oklahoma Water Resources Board.

Jason B. Aamodt, Rayanne G. Tobey, Aamodt & Tobey, Tulsa, OK, for intervenors/appellees, Gary Green, Earl Brewer, John Bruno, and Reginald Easterling as members of the Citizens for the Preservation of The Arbuckle–Simpson Aquifer.

D. Craig Shew, Smith, Shew, Scrivener & Corbin, Ada, OK, for intervenor/appellee, the City of Ada.

Charles W. Shipley, Robert D. Kellogg, Jamie Taylor Boyd, Shipley & Kellogg, P.C., Tulsa, OK, for intervenors/appellees, The Arbuckle Master Conservancy District and the Cities of Ardmore, Davis, Durant, Sulphur, Tishomingo and Wynnewood.

Neal Leader, Senior Assistant Attorney General, Oklahoma City, OK, for the Office of the Attorney General.[1]

---

1. Identified herein are only those counsel of the parties whose names appear on the appellate paperwork.

TAYLOR, J.

¶1 Plaintiffs/appellants challenge recent amendments to the Oklahoma Groundwater Law, 82 O.S.2001, §§ 1020.1, *et seq.* The challenged legislation,[2] codified at 82 O.S.Supp.2003, §§ 1020.9, 1020.9A and 1020.9B, relates to "sensitive sole source groundwater basins." It defines "sensitive sole source groundwater basin" as:

> a major groundwater basin or subbasin all or a portion of which has been designated as a "Sole Source Aquifer" by the United States Environmental Protection Agency pursuant to the Safe Drinking Water Act, as of the effective date of this act, including any portion of any contiguous aquifer located within five (5) miles of the known areal extent of the surface out-crop of the sensitive sole source groundwater basin.

82 O.S.Supp.2003, § 1020.9A(B)(1). The challenged legislation imposes moratoria on 1) issuing temporary permits that would lead to any additional municipal or public use of water from a sensitive sole source groundwater basin at locations outside of the basin and 2) contracting by municipalities and other political subdivisions outside a sensitive sole source groundwater basin for water from the basin. 82 O.S.Supp.2003, §§ 1020.9A(B)(1) and 1020.9B(A). The moratoria are effective until a hydrological study is completed and the Oklahoma Water Resources Board determines a maximum annual yield for the sensitive sole source groundwater basin. 82 O.S.Supp.2003, §§ 1020.9A(B)(2) and 1020.9B(B). The challenged legislation also requires the Oklahoma Water Resources Board, before issuing a permit to withdraw water from a sensitive sole source groundwater basin, to determine if the proposed use is likely to degrade or interfere with springs or streams emanating in whole or in part from water originating from the sensitive sole source groundwater basin. 82 O.S.Supp. 2003, § 1020.9(A)(1)(d).

¶2 The legislation is challenged as: 1) a special law regulating municipal and county affairs contrary to the Okla. Const., art. 5, § 46; 2) a special law relating to a subject area that can be dealt with in a general law contrary to the Okla. Const., art. 5, § 59; 3) a special law with no notice as required by the Okla. Const., art. 5, § 32; 4) a taking of private property without just compensation contrary to the Okla. Const., art. 2, § 24 and the U.S. Const., Fifth Amendment, Takings Clause; and 5) discriminatory treatment of landowners contrary to the U.S. Const., Fourteenth Amendment, Equal Protection Clause. We conclude the challenged legislation is valid and uphold the legislation codified at 82 O.S.Supp.2003, §§ 1020.9, 1020.9A and 1020.9B.

## I. Facts and Proceedings Below

¶3 The plaintiffs/appellants, Jacobs Ranch, LLC, Roos Ranch, Inc., and Roos Resources, Inc., claim rights in and to the groundwater in the Arbuckle–Simpson Groundwater Basin underlying their property in Pontotoc County. They also claim to be holders of temporary permits for the withdrawal of that groundwater.

¶4 The defendants/appellees, Oklahoma Water Resources Board (OWRB) and Duane A. Smith, Executive Director of the OWRB, are responsible for the administration and enforcement of Oklahoma's groundwater law. The municipal intervenors, Ardmore, Davis, Durant, Sulphur, Tishomingo, Wynnewood and Ada, receive all or a portion of their water supply from the Arbuckle–Simpson Groundwater Basin. Other intervenors are the Arbuckle Master Conservancy District and some of the members of Citizens for the Preservation of the Arbuckle–Simpson Aquifer.

¶5 The Arbuckle–Simpson Groundwater Basin is a major groundwater basin as defined by the Oklahoma Groundwater Law. 82 O.S.2001, § 1020.1. It lies entirely within the State of Oklahoma. It extends into five counties- Pontotoc, Murray, Johnston, Carter and Coal counties. It has depths greater than any other aquifer in the state, and its hydraulic and geologic conditions are unique in the state. It is a predominately carbonate

---

**2.** Senate Bill No. 288 of the First Regular Session of the Forty–Ninth Oklahoma Legislature,

2003 Okla. Sess. Laws, ch. 365.

aquifer that provides high-sustained flows to its springs and streams. Its carbonate formation, the limestone and dolomite strata, causes the recharge and discharge rates to be less predictable than aquifers with the more common sandstone and shale formations.

¶ 6 The Arbuckle–Simpson Groundwater Basin serves as a source of good-quality drinking water to many domestic users, municipalities and parks in the area overlying the basin. The United States Environmental Protection Agency (EPA) has designated a portion of the Arbuckle–Simpson Groundwater Basin as a sole source aquifer pursuant to the Safe Drinking Water Act, 42 U.S.C. §§ 300g and 300h–3 e.[3] There are a total of seventy-two designated sole source aquifers in the continental United States.

¶ 7 The municipal intervenors receive drinking water from the Arbuckle–Simpson Groundwater Basin or sources that originate in the basin. Municipal and public water supply use is one of the largest uses of water permitted to be withdrawn from the Arbuckle–Simpson Groundwater Basin.

¶ 8 The OWRB has the duty to make a hydrologic survey and investigation of each groundwater basin in Oklahoma at least every twenty years. 82 O.S.2001, § 1020.4. The OWRB also has the duty to determine a maximum annual yield of groundwater to be produced from each groundwater basin. 82 O.S.2001, § 1020.5. Any regular permit to withdraw water from a groundwater basin must be based upon a completed hydrological study and a maximum annual yield determination. 82 O.S.2001, § 1020.11.

¶ 9 The Oklahoma Geological Survey and the United States Geological Survey studied the hydrology of the Arbuckle–Simpson Groundwater Basin. In 1990, those agencies reported on the hydrology of the Arbuckle–Simpson Groundwater Basin but the report was not prepared to support a finding of the maximum annual yield by the OWRB. The OWRB advises that a hydrological study sufficient to determine a maximum annual yield will be completed in the calendar year of 2008.

¶ 10 In 1985 and 1986, the OWRB issued temporary permits to withdraw water for public and municipal use to plaintiffs/appellants based on their interests in land in Pontotoc County overlying the Arbuckle–Simpson Groundwater Basin. The temporary permits were revalidated annually until 2003. Beginning in 2003, numerous protests objecting to any further revalidation of plaintiffs'/appellants' temporary permits have been filed with the OWRB.

¶ 11 Plaintiffs/appellants did not withdraw any water from the Arbuckle–Simpson Groundwater Basin pursuant to their temporary permits.[4] However, in 2003 plaintiffs/appellants proposed to begin selling more than twenty billion gallons of water annually from the Arbuckle–Simpson Groundwater Basin to municipalities in Cana-

3. 42 U.S.C. §§ 300g and 300h–3(e) authorize the Administrator of the EPA 1) to determine that an area has an aquifer which is the sole source or principal source of drinking water for the area and which, if contaminated, would create a significant hazard to public health and to publish notice of the determination in the Federal Registry and 2) to withhold federal financial assistance for any project that may contaminate the sole source aquifer. On September 25, 1989, the EPA Administrator designated a portion of the Arbuckle–Simpson Aquifer system as a sole source aquifer, determining that 1) the aquifer supplies all of the public and domestic water consumed in an area comprising portions of Johnston, Murray and Pontotoc counties, 2) there is no existing alternative drinking water source or combination of sources which provides fifty percent or more of the drinking water to the area, and 3) there is no available cost-effective source capable of supplying the drinking water demands for the designated area. Notice of the EPA designation is published at 54 F.R. 39230.

Federal funds are available to protect an area located within a designated sole source aquifer. 42 U.S.C. § 300h–6. The area to be protected must be identified as a critical aquifer protection area by the following criteria: 1) vulnerability of the aquifer to contamination due to hydrogeologic characteristics, 2) number of people using the aquifer as a drinking water source, 3) economic, social and environmental benefits to the area by maintaining high quality drinking water, and 4) economic, social and environmental costs due to degradation of the quality of the water. 42 U.S.C. § 300h–6(d).

4. This dispute does not involve the landowners' rights to the water as provided in 60 O.S.2001, § 60. Landowners have a statutory right to withdraw groundwater for domestic use without a permit. 82 O.S.2001, § 1020.3.

dian County, Oklahoma. Although no Canadian County municipality is involved in this litigation, plaintiffs/appellants assert that the Canadian County municipalities depend on groundwater sources that may become impractical in the future due to more restrictive arsenic standards for drinking water. Those municipalities also purchase water from Oklahoma City.[5]

¶ 12 Without a sufficient hydrological study, the effect of plaintiffs'/appellants' proposed withdrawal of water from the Arbuckle–Simpson Groundwater Basin can not be determined by the OWRB. However, it is undisputed that: 1) aquifers in Oklahoma have suffered irreversible decline where withdrawals exceeded the aquifer's ability to recharge, such as the Ogallala Aquifer; 2) decline in the groundwater level has resulted in the loss of the natural flow of streams, such as the Beaver River in the Oklahoma panhandle; and 3) a decline in the groundwater level of the Arbuckle–Simpson Groundwater Basin could jeopardize the flow of springs and streams, such as the spring that is the source of the water for the city of Ada.

¶ 13 In 2003, the Oklahoma Legislature passed Senate Bill No. 288 and the Governor signed it into law.[6] The measure expressly found that "a moratorium is necessary on the issuance of certain temporary permits on certain sensitive sole source groundwater basins or subbasins to protect the health, safety and welfare of the people of Oklahoma." 82 O.S.Supp.2003, § 1020.9A(A).

¶ 14 A major groundwater basin designated as a sole source aquifer, the Arbuckle–Simpson Groundwater Basin falls within the statutory definition of a "sensitive sole source groundwater basin." 82 O.S.Supp.2003, § 1020.9A(B)(1). Presently, it is the only sensitive sole source groundwater basin in the state.

¶ 15 Plaintiffs/appellants filed this action asking that the sensitive sole source groundwater basin law be struck down as inconsis-

tent with the federal and state constitutions. They moved for summary judgment.

¶ 16 The district court concluded that the sensitive sole source groundwater basin law is valid and enforceable and entered summary judgment in favor of the defendants and intervenors. Plaintiffs appealed. This Court retained the appeal.

## II. Standard of Review

■ ¶ 17 Summary judgment disposes solely of issues of law which we review by a *de novo* standard. *Manley v. Brown,* 1999 OK 79, 989 P.2d 448, 455. Our *de novo* review is plenary, independent and non-deferential. *Gladstone v. Bartlesville Indep. Sch. Dist. No. 30,* 2003 OK 30, ¶ 5, 66 P.3d 442, 445.

■ ¶ 18 Here, the issue is the constitutionality of the 2003 amendments to the groundwater statutes. There is a strong presumption that the statutes are constitutional. *Black v. Ball Janitorial Service, Inc.,* 1986 OK 75, ¶ 5, 730 P.2d 510, 512. In deciding their constitutionality, the statutes will be upheld unless they are clearly inconsistent with the constitution. *Id.*

## III. The trial court's ruling on plaintiffs' standing

¶ 19 The dissenting opinion raises a threshold issue which we are obliged to address before we proceed to review the merits of the summary judgment on appeal. The dissent takes the position that there is no clear paper trail of the trial court's ruling on plaintiffs' standing raised in defendants' dismissal motion and asserted as an affirmative defense in intervenors' answer.

¶ 20 The record before this Court shows that the trial court did make a determination that plaintiffs have standing to maintain this declaratory judgment action. On July 15, 2003, the defendants filed a motion to dismiss for, among other grounds, lack of standing. The motion was fully briefed. On September 25, 2003, the trial court heard arguments on

---

**5.** Apparently, the Canadian County municipalities plan to transport the water through some eighty miles of pipeline from the Arbuckle–Simpson Groundwater Basin to Canadian Coun-

ty. The cost of the pipeline project is estimated to be between $150 million and $200 million.

**6.** *See* footnote 2 *supra.*

the dismissal motion and entered a minute order overruling the motion. The trial court memorialized the September 25th ruling in a journal entry filed on October 6, 2003.

¶ 21 The appellate record does not show that the intervenors directly challenged plaintiffs' standing in their summary judgment filings. The dissenting opinion correctly notes that the answers filed by the municipal intervenors alleged that plaintiffs lacked standing as an affirmative defense. But the dissenting opinion reaches to find a standing challenge in the attack on plaintiffs' status as permit holders in the municipal intervenors' cross-motion for partial summary judgment. It also reaches to find a standing challenge in the attack on plaintiffs' lack of economic injury in the municipal intervenors' argument responding to plaintiffs' summary judgment argument that plaintiffs have not suffered an unconstitutional taking.

¶ 22 The appellate record shows that defendants directly challenged plaintiffs' standing before the trial court. The trial court ruled against the defendants on their challenge to plaintiffs' standing in a journal entry filed of record. Intervenors did not file a motion to dismiss plaintiffs' petition for lack of standing nor did they directly challenge plaintiffs' standing to maintain this declaratory judgment action in their summary judgment filings. The plaintiffs filed their motion for summary judgment. The municipal intervenors filed a response to the summary judgment motion and a cross-motion for partial summary judgment. The citizen intervenors filed a response to the summary judgment motion. The trial court proceeded to summarily dispose of the merits of the controversy argued by all the parties on summary judgment.

¶ 23 The trial court's ruling on plaintiffs' standing is not drawn by implication from mere silence. It is clear in this record that the trial court recognized plaintiffs' standing, as it had earlier determined, when it allowed the plaintiffs to be heard on the merits and when it proceeded to consider and rule upon the merits of the summary judgment filings.

## IV. Exercise of police power to regulate water resources

¶ 24 Defending the constitutionality of the challenged legislation, the Attorney General argues that the measure is an exercise of the Legislature's police power for the purpose of regulating the state's water resources. Police power is an attribute of state sovereignty. *Gibbons v. Missouri K. & T.R. Co.*, 1930 OK 108, 285 P. 1040, *Syllabus by the Court*. It is generally an inherent power of the state legislature that extends to the whole system of internal regulation by which the state preserves public order, prevents offenses against the state, and insures to the people the enjoyment of rights and property reasonably consistent with like enjoyment of rights and property by others. *Id.* Through the exercise of its police power, the Legislature determines what is necessary for the peace and welfare of the people. *Edmondson v. Pearce*, 2004 OK 23, ¶ 34, 91 605, 623, 91 P.3d 605.

¶ 25 The Legislature may exercise its police power to regulate any property within the jurisdiction of the state when regulation is necessary to secure the general safety, the public welfare, and the peace and good order of the community. *Gibbons*, 285 P. at 1042. The Legislature may exercise its police power to regulate the use and enjoyment of property when the free exercise of such use is detrimental to the public interest. *Phillips Petro. Co. v. Corp. Comm'n*, 1956 OK 313, 312 P.2d 916.

¶ 26 It is a basic principle that water is a natural resource, *Sheldon v. Grand River Dam Auth.*, 1938 OK 76, 76 P.2d 355; *Anderson–Prichard Oil Corp. v. Okla. Corp. Comm'n*, 1951 OK 234, 241 P.2d 363; *Kline v. Okla. Water Resources Bd.*, 1988 OK 18, 759 P.2d 210, which the state may regulate for the health, welfare and safety of the people. *See, Wyoming v. Colorado*, 259 U.S. 419, 42 S.Ct. 552, 66 L.Ed. 999 (1922); *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dept. Of Natural Resources*, 504 U.S. 353, 365, note 6, 112 S.Ct. 2019, 2026–2027, 119 L.Ed.2d 139 (1992). The Legislature may exercise its police power to protect the state's water irrespective of the rights of private owners of the land most immediately

concerned. *Hudson County Water Co. v. McCarter,* 209 U.S. 349, 355, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908). For the health, welfare and safety of its citizens, the Legislature may regulate a landowner's use and enjoyment of water resources to prevent waste and infringement on the rights of others. *Franco–American Charolaise, Ltd. v. Okla. Water Resources Bd.,* 1990 OK 44, 855 P.2d 568, 576; *Kline v. Okla. Water Resources Bd.,* 759 P.2d at 212.

### V. Oklahoma's Groundwater Statutes

¶ 27 The OWRB asserts that the Legislature, in regulating groundwater, has classified groundwater basins as minor basins and major basins and that the challenged legislation is a further classification for the protection of basins that supply drinking water for communities. The OWRB argues that the challenged legislation is sound management and stewardship of unique aquifers within the current regulatory system of allocation for reasonable use.

¶ 28 An overview of the groundwater statutes is helpful in our analysis of the challenged legislation. In 1949, the Oklahoma Legislature enacted the Oklahoma Ground Water Law to regulate the taking and use of ground water in order "to conserve and protect the ground water resources of the State."[7] The 1949 law restricted landowners to withdrawing only the safe annual yield of a basin as measured by its average annual recharge. 82 O.S.1951, § 1015; *Okla. Water Resources Bd. v. Texas County Irrigation and Water Resources,* 1984 OK 96, ¶ 6, 711 P.2d 38, 41. The Legislature determined that the ground water regulation served "the interest of agricultural stability, domestic, municipal, industrial and other beneficial uses, general economy, health and welfare of the State and its citizens...." 82 O.S.1951, § 1003.

¶ 29 In 1972, the Oklahoma Legislature repealed the 1949 Ground Water Law[8] and enacted a new statutory scheme "to utilize the groundwater resources of the state." The 1949 conservation policy was replaced by

a reasonable utilization policy. *Okla. Water Resources Bd. v. Texas County Irrigation and Water Resources,* 711 P.2d at 41. The 1972 legislation provided for "the allocation for reasonable use based on hydrologic surveys of fresh ground water basins or subbasins to determine a restriction on the production, based upon the acres overlying the ground water basin or subbasin." 82 O.S.Supp.1972, § 1020.2. In the 1972 enactment, the Oklahoma Legislature declared that a water utilization policy was necessary for the health and welfare of the state and its citizens. *Id.*

¶ 30 Enacted in the exercise of the Legislature's police power, the current groundwater law, 82 O.S.2001, §§ 1020.1 *et seq.,* is the 1972 regulatory regime for the reasonable utilization of the state's groundwater resources and the subsequent amendments thereto. The challenged amendments impose a moratorium against the transfer of water for out-of-basin municipal and public use and interject a conservation requirement to the utilization regime. As amended, the groundwater law requires a permit applicant to show that the withdrawal of water is not likely to degrade or interfere with springs or streams emanating in whole or in part from water originating from the sensitive sole source groundwater basin.

### VI. The Okla. Const., art. 5, § 59

¶ 31 Plaintiffs/appellants contend that the challenged legislation is unjustifiably limited to the Arbuckle–Simpson Groundwater Basin without naming it and that the limitation is irrational and a subterfuge for a special law, relying on *Elias v. City of Tulsa,* 1965 OK 164, 408 P.2d 517. They argue that the classification of "sensitive sole source groundwater basin" is invalid because it is not reasonably related to a valid legislative objective, citing *Reynolds v. Porter,* 1988 OK 88, 760 P.2d 816. They further argue that the withdrawal of water for out-of-basin use and the reduction in stream flow due to groundwater pumping could be addressed on a statewide basis as was done in the groundwater statutes, 82 O.S.2001, §§ 1020.1–

---

7. 1949 Okla. Sess. Laws, ch. 11, § 3, codified at 82 O.S.1951, § 1003.

8. 1972 Okla. Sess. Laws, ch. 248, § 23.

1020.22, and that the subject could be legislated upon in a general law as required under art. 5, § 59, citing *Grant v. Goodyear Tire & Rubber Co.,* 2000 OK 41, 5 P.3d 594.

¶ 32 The Oklahoma Constitution, art. 5, § 59 imposes two distinct restrictions upon lawmakers. It requires that "laws of a general nature" must operate uniformly throughout the state. It also prohibits the enactment of a "special law" where a "general law" can be applied. Article 5, § 59 reads:

Laws of a general nature shall have a uniform operation throughout the State, and where a general law can be made applicable, no special law shall be enacted.

 ¶ 33 Article 5, § 59 was included in the original Constitution of the State of Oklahoma. At statehood the meanings of the terms "law of a general nature," "general law," "special law" and "uniform operation" were established.[9] A "law of a general nature" related to a subject of common interest to the whole state. J.G. Sutherland, *Statutes and Statutory Construction* 148–150 (1891). A "general law" related to a subject of common interest to the whole state and embraced the whole subject or a whole class related to the subject.[10] *Id.* Although it might have related to a subject of common interest to the whole state, a "special law" embraced particular persons or things of a class but not the whole subject or whole class. *Id.* A law had "uniform operation" throughout a state when it related to a subject of common interest to the whole state and the Legislature did not apply it to partic-

ular localities or prohibit its operation in particular locations, even though it did not practically operate in every part of the state. *Id.*

¶ 34 Immediately after statehood, this Court considered the uniformity restriction imposed upon lawmakers by art. 5, § 59. *Anderson v. Ritterbusch,* 1908 OK 250, 98 P. 1002, *State ex rel. Smith v. Brown,* 1909 OK 199, 103 P. 762, and *Burks v. Walker,* 1909 OK 317, 109 P. 544. In *Anderson,* a statute establishing a procedure to collect taxes on omitted property was challenged as contrary to art. 5, § 59 because it had no practical application in the eastern half of the state, pre-statehood Indian Territory. *Anderson* determined the challenged statute had uniform application across the state even though the dissimilarities in the governmental and industrial conditions in Oklahoma Territory and Indian Territory caused a difference in the statute's application. In so ruling, *Anderson* quoted *Noffzigger v. McAllister,* 12 Kan. 315:

Whenever a law of a general nature is passed by the Legislature for the whole state, and is not applied by the Legislature to any particular locality thereof and has no words prohibiting its operation in any particular locality thereof, it is a law of uniform operation throughout the state, within the meaning of the constitutional provision, although it may not practically have operation in every part of the state. *Anderson,* 1908 OK 250, ¶ 26, 98 P. at 1009.

¶ 35 In *State ex rel. Smith v. Brown,* a statute providing for the removal of sheriffs,

9. We read constitutional provisions to give effect to the intent of the framers and the people in adopting them. *Boswell v. State,* 1937 OK 727, 74 P.2d 940. J.G. Sutherland, *Statutes and Statutory Construction* 144 (1891) observed that in the second half of the Nineteenth Century, several state constitutions required statewide uniform operation of laws of a general nature. The provision was intended to require just and equal laws and to prevent, as far as possible, enactments which were not such. *Id.* It was intended to prevent the granting of privileges to any citizens or class of citizens which was not granted to all the citizens upon the same terms. *Id.* at 151. The frequency and inconvenience of local and special legislation in public acts led to the adoption of the uniformity requirement. *Id.* at 147.

10. Sutherland at 147. Sutherland explained that legislation is general in nature because the sub-

ject matter is of common interest to the whole state. Sutherland recognized that generic subjects of legislation may be divided. For instance, laws dealing with people may be divided into classes such as voters, sane and insane persons, minors, husbands and wives, parents and children. He also explained that the subject of a statute may be general, but if the statute is limited in its scope, it may be a special statute. *Id.* at 151. For instance, fees for local officers is a general subject and extends to every political subdivision in the state, but a statute prescribing fees for particular counties is a special law on a general subject. *Id.* at 152. He further explained that a law on a subject general in nature may operate only upon a class if the class has peculiar characteristics which require exclusive legislation. *Id.* at 162.

constables, marshals, police officers, and city and county attorneys for failure to diligently enforce the prohibition laws was challenged as contrary to art. 5, § 59 because it applied to some but not all county, township and municipal officers. *State ex rel. Smith* determined the challenged statute had uniform application across the state because it applied to all the local officers in the class of officers who had the duty to enforce the prohibition laws.

¶ 36 In *Burks v. Walker*, a statute establishing a county superior court in each county that had at least 30,000 inhabitants and a city with 8,000 inhabitants was challenged as a special law with local application. Recognizing that a law of a general nature may have uniform operation throughout the state even though it operates only upon a legislative class, *Burks*, 1909 OK 317, ¶ 23, 109 P. at 549, explained:

> In order for a law to be general in its nature and to have a uniform operation, it is not necessary that it shall operate upon every person and every locality in the state. A law may be general and have a local application or apply to a designated class if it operates equally upon all the subjects within the class for which it was adopted. To determine whether or not a statute is general or special, courts will look to the statute to ascertain whether it will operate uniformly upon all the persons and parts of the state that are brought within the relation and circumstances provided by it. *People ex rel. v. Hoffman*, 116 Ill. 587[, 5 N.E. 596, 8 N.E. 788 (1886)]; *Nichols v. Walter et al.*, 37 Minn. 264, 33 N.W. 800. And the operation is uniform if it affects alike all persons in like situation. But where a statute operates upon a class, the classification must not be capricious or arbitrary and must be reasonable and pertain to some peculiarity in the subject matter calling for the legislation. As between the persons and places included within the operation of the law and those omitted, there must be some distinctive characteristic upon which a different treatment may be reasonably founded and that furnish a practical and real basis for discrimination. *Nichols v. Walter, supra.*

¶ 37 This Court has tested a plethora of statutes for conformity with the requirements of art. 5, § 59. Adhering to the art. 5, § 59 principles pronounced at statehood, our extant jurisprudence tests a legislative classification in a law of a general nature to determine if the distinction of the persons, entities or things (the class) has a reasonable and substantial basis and a sound and rational relation to the subject of the legislation. *See, Hudgins v. Foster*, 1928 OK 243, ¶ 30, 267 P. 645, 649 (striking down a statute abolishing township offices in forty-nine counties but not the remaining twenty-eight counties for lack of reasonable basis); *Roberts v. Ledgerwood*, 1928 OK 723, ¶ 18, 272 P. 448, 452 (striking down a statute imposing the duty to oversee road and bridge work on county commissioners, with incremental salaries, only in counties that fall within specific population levels as arbitrary and without relation to the subject matter of the statute); *Sheldon v. Grand River Dam Authority*, 1938 OK 76, ¶ 17, 76 P.2d 355, 361 (upholding a statute creating a reclamation district for the Grand River Dam Authority as reasonable with sound and rational relation to the subject of the legislation); *Elias v. City of Tulsa*, 1965 OK 164, ¶¶ 9–10 and 20, 408 P.2d 517, 519–520 (striking down a statute providing for a city-county cooperative planning commission in cities within specific population limits fitted to Tulsa only as arbitrary and a subterfuge); *Isaacs v. Oklahoma City*, 1966 OK 267, 437 P.2d 229 (upholding population-based classification for urban redevelopment as reasonable); *Tulsa Expo. & Fair Corp. v. Bd. Of County Comm'rs*, 1970 OK 67, ¶ 22, 468 P.2d 501, 507 (striking down a statute authorizing county fairs only in counties having a population between 100,000 and 200,000 as not related to the subject matter); *Reynolds v. Porter*, 1988 OK 88, 760 P.2d 816 (striking down medical negligence statute of limitations as special law prohibited by art. 5, § 46); and *Kerley v. Uniroyal Goodrich Tire Co.*, 2000 OK 62, 10 P.3d 230 (striking down workers' compensation statute allowing only self-insured employers to recoup overpayment of temporary disability as underinclusive class legislation). Under the reasonable basis and the rational relation tests, the court must

determine if the legislative classification rests upon a reasonable difference that bears a rational relation to the purposes and goals of the legislation, i.e., does the classification further a legitimate state purpose or interest.

## VII. Analysis of the challenged legislation under the Okla. Const., art. 5, § 59

¶ 38 The essence of plaintiffs'/appellants' challenge is that the sensitive sole source groundwater legislation creates an invalid classification prohibited by the Okla. Const., art. 5, § 59. This challenge requires us to inquire into 1) the nature of the legislation, 2) the legislative classification and 3) the uniformity of its operation.

¶ 39 As to its nature, the sensitive sole source groundwater basin legislation relates to the state's water resources that supply safe drinking water to the basin area and to all the people who live, work or visit there. Unquestionably, safe drinking water is a subject of common interest throughout the state and a rightful subject for legislative regulation. The sensitive sole source groundwater basin legislation is a law of a general nature.

¶ 40 As to the legislative classification of "sensitive sole source groundwater basin," we must determine whether there are distinguishing characteristics which make "sensitive sole source groundwater basins" really different from other groundwater basins in the state. The Legislature determined that a sensitive sole source groundwater basin is different from other major groundwater basins by virtue of the EPA's "Sole Source Aquifer" designation. The EPA designation protects all within a sole source aquifer area that depend upon the aquifer for safe drinking water. The designation allows the EPA to review federal financially assisted projects in the out-crop area of a sole source aquifer or its streamflow source area to ensure projects do not contaminate the aquifer and threaten public health. 54 F.R. 39230. We conclude the EPA's designation of "Sole Source Aquifer" is a substantial and reasonable distinction that makes the "sensitive sole source groundwater basin" class different from other major groundwater basins in this state.

¶ 41 We must next determine whether the classification is rationally related to the purpose of the legislation. Plaintiffs/appellants assert that the actual purpose of the challenged legislation is to stop the transport of water to Canadian County municipalities for municipal and public use without interfering with other temporary permits. The legislation does not single out Canadian County municipalities. It finds that a moratorium on the issuance of temporary permits on "sensitive sole source groundwater basins" is needed to protect the health, safety and welfare of the people of Oklahoma. 82 O.S.Supp. 2003, § 1020.9A(A). And, it imposes a moratorium on the issuance of temporary permits for out-of-basin municipal or public use until it is determined that further removal of water from the "sensitive sole source groundwater basin" will not reduce the flow of its springs and streams. 82 O.S.Supp.2003, § 1020.9A(B)(2).

¶ 42 It is undisputed that the source of safe drinking water for in-basin use may be degraded by the transfer of large quantities of water for out-of-basin use. It is also undisputed that public use is one of the largest uses of the Arbuckle–Simpson groundwater. Anticipating that the transfer of water to out-of-basin municipalities might interfere with the availability of safe drinking water for in-basin use, the Legislature decided to preserve the sources of safe drinking water for in-basin use until completion of a hydrological study and determination of a maximum annual yield. Accordingly, we conclude that the purpose of the challenged legislation is to conserve the sole source of safe drinking water for use in the area overlying the sensitive sole source groundwater until a hydrological study is completed and a maximum annual yield is determined that ensures the withdrawal of water will not interfere with the in-basin drinking water supply.

¶ 43 Different treatment of in-basin public use and out-of-basin public use does not make the legislation a special law because the in-basin area and out-of-basin areas are not in like situations. The in-basin area relies solely on the aquifer for drinking water. The bases for the EPA designation are that the drinking water in the designated sole

source aquifer area is provided by the Arbuckle–Simpson aquifer and that there are no existing alternative drinking water sources nor cost-effective sources capable of supplying the drinking water demands for the designated area. 54 F.R. 39230. The distinction between in-basin use and out-of-basin use has a rational relation to the purpose of the legislation. We conclude that the classification of groundwater basins designated by the EPA as "Sole Source Aquifers" is rationally related to the conservation of safe drinking water for use in the overlying area.

¶ 44 As to its uniform operation, we must determine whether the "sensitive sole source groundwater basin" classification limits the legislation's application to particular locations or particular persons thereby preventing statewide uniform application of the law. Plaintiffs/appellants argue that the class embraces only the Arbuckle–Simpson Groundwater Basin and those persons having an interest in the overlying land. They urge that the class is not open to any other groundwater basins in the state that the EPA may in the future designate as sole source aquifers because the legislation defines sole source aquifer designated by the EPA "as of the effective date of this act." We disagree.

¶ 45 The challenged legislation is framed in general language to apply to the whole class of major groundwater basins designated by the Administrator of the EPA to be sole source aquifers in accordance with the Safe Drinking Water Act, 42 U.S.C. §§ 300g and 300h–3(e). As a general rule, a statute is applied prospectively unless the language evidences an intent that it also be applied retrospectively.[11] The statutory language defining the "sensitive sole source groundwater basin" class as those basins designated sole source aquifers "as of the effective date of this act" expresses an intent that the legislation shall apply to any sole source

aquifer so designated prior to its effective date. However, we glean no intent, express or implicit, from the legislation that it would not apply to any major groundwater basin in this state which, in the future, the EPA designates as a sole source aquifer. We conclude the sensitive sole source groundwater basin legislation operates uniformly throughout the state upon all major groundwater basins designated as sole source aquifers before and after its effective date and all persons brought within the circumstances provided by it. The fact that there was only one groundwater basin designated by the EPA as a "Sole Source Aquifer" when the challenged legislation was enacted does not destroy its uniform operation throughout the state.

¶ 46 In summary, the challenged sensitive sole source groundwater basin legislation is a law of a general nature. The legislative classification of "sensitive sole source groundwater basins" is reasonable and rationally related to the purpose of the legislation. The sensitive sole source groundwater basin legislation operates uniformly throughout the state upon all major groundwater basins designated, presently and in the future, as sole source aquifers. The challenged legislation is a valid general law under the Okla. Const., art. 5, § 59. Because the challenged legislation is a general law, we need not consider plaintiffs'/appellants' argument on the notice requirements for a special law under the Okla. Const., art. 5, § 32.

## VIII. The Okla. Const., art. 5, § 46

¶ 47 Plaintiffs/appellants challenge the sensitive sole source groundwater basin legislation as contrary to art. 5, § 46 of the Oklahoma Constitution.[12] They contend that the moratorium on contracts in the sensitive sole source groundwater basin legislation is a special law regulating municipal and county affairs.[13] They argue that the moratorium

---

11. *Seal v. Okla. Corporation Comm'n*, 1986 OK 34, ¶ 51, 725 P.2d 278, 294.

12. Section 46 provides in part:

The legislature shall not, except as otherwise provided in this Constitution, pass any local or special law . . .

Regulating the affairs of counties, cities, towns, wards, or school districts. . . .

13. Title 82 O.S.Supp.2003, § 1020.9B reads:

A. A moratorium is hereby established on any municipality or other political subdivision of this state prohibiting any such entity from entering into a contract or other agreement

regulates municipal and county affairs because it impacts the ability of out-of-basin municipalities and counties to enter into contracts for their public water supplies. They also argue it is a special law because it applies to some but not all counties and municipalities in the state and to only the Arbuckle–Simpson Groundwater Basin.

¶ 48 We have already determined that the challenged legislation relates to a subject of common interest throughout the state and that it regulates the state's water resources through the exercise of the state's police power for the health, welfare and safety of the public. Clearly, regulation of groundwater resources for the benefit of the public is a statewide concern. Although we are mindful of the fact that water supply is a basic concern of each of our political subdivisions, we do not view the regulation of the state's water resources as an affair of counties, cities or towns under art. 5, § 46. Accordingly, we need not further consider plaintiffs'/appellants' art. 5, § 46 arguments.

¶ 49 We have also determined that the purpose of the challenged legislation is to conserve the sole source of safe drinking water for in-basin use until a hydrological study is completed and a maximum annual yield is determined that ensures the withdrawal of water will not interfere with the in-basin drinking water supply. Obviously, § 1020.9B was intended to serve that legislative purpose.

## IX. The Takings Clauses in the U.S. Const., Fifth Amendment and the Okla. Const., art. 2, § 24.

¶ 50 Plaintiffs/appellants argue that the sensitive sole source groundwater basin legislation constitutes a taking of private property without just compensation contrary to the U.S. Const., Fifth Amendment, Takings Clause and the Okla. Const., art. 2,

§ 24. We are not convinced. The general rule is that the Legislature may *restrict the use and enjoyment of the state's water resources* by exercise of its police power for the preservation of the public health, safety and welfare without compensating the property owner. *Franco–American Charolaise, Ltd. v. Okla. Water Resources Bd.*, 1990 OK 44, 855 P.2d 568, 576. The challenged legislation regulates the state's water resources expressly "to protect the health, safety and welfare of the people of Oklahoma." 82 O.S.Supp.2003, 1020.9A(A).

¶ 51 The Takings Clause of the Fifth Amendment to the Constitution of the United States provides "nor shall private property be taken for public use without just compensation." The recent case of *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002), observed that the Fifth Amendment Takings Clause requires compensation whenever the government appropriates private property for a public interest, but it does not necessarily require just compensation where government regulations "prohibit a property owner from making certain uses of her private property." *Id.* at 321–322, 122 S.Ct. 1465. Whether a regulatory prohibition amounts to a taking under the Fifth Amendment depends upon all the relevant facts and circumstances. *Id.* at 322, 122 S.Ct. 1465.

¶ 52 The Oklahoma Constitution, art. 2, § 24 provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." While a governmental taking of private property for public use must be compensated, a reasonable government regulation of the property is not compensable. *Suntide Inn Operating Corp. v. State*, 1977 OK 204, 571 P.2d 1207, 1209. In this regard, *Suntide*, at 1210, quoted *Gib-*

which would lead to municipal or public water supply use of groundwater from a sensitive sole source groundwater basin as defined in Section 1 of this act. Said moratorium shall apply only to municipalities or political subdivisions which are located outside of any county that overlays in whole or in part said basin or subbasin.

B. Said moratorium shall be in effect until such time as the Oklahoma Water Resources Board conducts and completes a hydrological study and approves a maximum annual yield that will ensure that any permit for the removal of water from a sensitive sole source groundwater basin will not reduce the natural flow of water from springs and streams emanating from said basin or subbasin.

*bons v. Missouri, K & T.R. Co.,* 1930 OK 108, 285 P. 1040:

> [A]cts done in the proper exercise of the police power, which merely impair the use of property, do not constitute a taking within the meaning of the constitutional requirements as to the making of compensation for the taking of property for public use, and accordingly do not entitle the owner of such property to compensation from the state or its agents, or give him any right of action for the injuries sustained. In other words, regulations which the state, in the exercise of its police power, authorizes with respect to the use of property are entirely independent of any question of compensation for such use. The question of compensation has no influence in establishing them. The exercise of the police power, therefore differs from the exercise of the right of eminent domain, which involves the appropriation of private property to public use, and requires, in its lawful exercise, pecuniary compensation for the loss inflicted on the owner.
>
> It is well settled that the state, or its agents, in the exercise of its police power can extend this power only to such measures as are reasonable under all the circumstances. The means adopted must bear some real and substantial relation or be reasonably necessary for the accomplishment of a legitimate object falling within the scope of the police power, and the law or regulation must tend toward the preservation of public welfare, health, safety, or morals.

*See also, Phillips Petro. Co. v. Corporation Comm'n,* 1956 OK 313, 312 P.2d 916 (holding that a statute requiring a natural gas producer to make gas available to pump water for agriculture irrigation at a price fixed by the Corporation Commission is not a regulation under the police power but a taking of the producer's property without due process of law and an appropriation of the producer's property without just compensation); and *Mattoon v. City of Norman,* 1980 OK 137, 617 P.2d 1347 (concluding that the exercise of the police power to divert surface water onto one's land must be tested under the rule of reason and holding that the enactment of a flood plain ordinance is not a *per se* taking of private property for public use).

¶ 53 The challenged legislation prohibits the OWRB from issuing temporary permits for out-of-basin municipal or public use until a hydrological study is completed and a maximum annual yield is determined. It also requires the OWRB, in considering applications for regular permits, to determine whether a proposed use is likely to degrade or interfere with springs or streams emanating from water originating from a sensitive sole source groundwater basin. We view this moratorium on temporary permits as a temporary restriction, at most, on the plaintiffs'/appellants' use of their water. We view the additional requirement on applicants for regular permits to be a proper regulation of the state's water resources in the exercise of the Legislature's police power. We conclude that under the facts and circumstances presented on summary judgment, the temporary moratorium on plaintiffs'/appellants' proposed use of water from the sensitive sole source aquifer and the additional permit requirement do not constitute a taking of private property for public use under the constitutions of the United States and the State of Oklahoma.

### X. The Equal Protection Clause in the U.S. Const., Fourteenth Amendment

¶ 54 Plaintiffs/appellants complain that the sensitive sole source groundwater basin classification causes disparate treatment of landowners and permit applicants and holders contrary to the U.S. Const., Fourteenth Amendment, Equal Protection Clause and Due Process Clause. We do not agree.

¶ 55 The United States Supreme Court has fashioned a two-tier equal protection framework. Equal protection analysis requires strict judicial scrutiny of statutes that operate to the peculiar disadvantage of a suspect class such as a class based on alienage or ancestry or that interfere with the exercise of a fundamental right grounded in the constitution such as the right to vote, right to interstate travel and rights guaranteed by the First Amendment. *Mass. Bd. Of Retirement v. Murgia,* 427 U.S. 307, 312, 96

S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976). Equal protection analysis of other statutes is the less stringent rational basis standard. The legislative class is examined for a rational relation to the objective of the statute. *Id.* at 314, 96 S.Ct. 2562. The rational relation inquiry is a "relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task" and such action by the Legislature is presumed valid. *Id.*

¶ 56 The "sensitive sole source groundwater basin" legislation does not relate to a fundamental right grounded in the constitution nor does it operate upon a suspect classification. Equal protection analysis of the legislation does not require strict judicial scrutiny. We have already examined the legislation for purposes of art. 5, § 59 and concluded that the "sensitive sole source groundwater basin" classification has a reasonable basis and it is rationally related to the purpose of the law. We reach the same conclusions for purposes of equal protection. The challenged legislation does not deny plaintiffs/appellants equal protection of the laws.

## XI. Conclusion

¶ 57 The utilization and the conservation of the state's water resources are rightful subjects for legislative regulation. The Oklahoma Legislature not only has the power to regulate but also the profound responsibility to allocate this precious natural resource for the benefit of the whole state. The state's water resources is a subject over which the Oklahoma Legislature must be vigilant and

act with prudence for the benefit of all the citizens in the state. Unquestionably, a statewide comprehensive policy for both the utilization and the conservation of the state's water is crucial to the health and welfare of every inhabitant in this state. We conclude the challenged groundwater legislation concerns a statewide interest and it operates uniformly throughout the state upon the legislative class of "sensitive sole source groundwater basins" that is reasonable and rationally related to the regulation of the state's water resources. We hold the challenged legislation is a valid general law under the Okla. Const., art. 5, § 59.

¶ 58 The district court concluded that the challenged legislation is "addressed to the Arbuckle–Simpson Aquifer." [14] This conclusion is inconsistent with our conclusions that the legislation is drafted in general terms and that it applies to any major groundwater basin that, in the future, may be designated by the EPA as a sole source aquifer. Even so, the district court reached the correct result. Where the trial court reaches the correct result for the wrong reasons or on incorrect theories, it will not be reversed. *Estate of Bartlett*, 1984 OK 9, 680 P.2d 369; *Dixon v. Bhuiyan*, 2000 OK 56, 10 P.3d 888. Accordingly, we affirm the district court's summary judgment in favor of defendants/appellees and intervenors/appellees.

**DISTRICT COURT'S SUMMARY JUDGMENT AFFIRMED.**

WATT, C.J., and LAVENDER, KAUGER (by separate writing), EDMONDSON, TAYLOR and COLBERT, JJ., concur.

---

14. The district court entered the following conclusions in the summary judgment order on appeal:
 1. There is no substantial controversy as to any material facts and Defendants and Intervenors are, as a matter of law, entitled to judgment.
 2. The Arbuckle–Simpson Aquifer is a unique aquifer in the State of Oklahoma.
 3. **The challenged law advances legitimate state interests in the protection of waters of the Arbuckle–Simpson Aquifer.**
 4. Because the Simpson–Arbuckle is unique, and thus there is no similarly situated aquifer in Oklahoma, the challenged statutes, though having local application, are nevertheless general laws, and thus advance public notice was not required, pursuant to Okla. Const. Art. 5 § 32, prior to their enactment. **As a general law addressed to the Arbuckle–Simpson Aquifer, the challenged enactment can lawfully treat waters from that aquifer in a manner different from waters in other aquifers in the State.** Such different treatment (temporary moratoria on licenses and contracts and required criterion) does not convert the general statute into a special or local law.
 5. The challenged enactments do not violate Plaintiff's equal protection right.
 6. The challenged enactments do not constitute a violation of due process nor an unconstitutional taking of property.
 (Emphasis added.)

OPALA, J., (by separate writing) dissents.

HARGRAVE, J., not participating.

WINCHESTER, V.C.J., disqualified.

KAUGER, J., with whom WATT, C.J., and EDMONDSON, J., join, concurring:

¶ 1 I agree with the majority that the statutes in question are not unconstitutional. This result is governed by our precedents beginning in 1909 with *Burks v. Walker*, 1909 OK 317, ¶ 23, 109 P. 544 in which we said:

> "In order for a law to be general in its nature and to have a uniform operation, it is not necessary that it shall operate upon every person and every locality in the state. A law may be general and have a local application or apply to a designated class if it operates equally upon all subjects within the class for which it was adopted. To determine whether or not a statute is general or special, courts will look to the statute to ascertain whether it will operate uniformly upon all the persons and parts of the state that are brought within the relation and circumstances provided by it. *People ex rel. v. Hoffman*, 116 Ill. 587[, 5 N.E. 596, 8 N.E. 788 (1886)]; *Nichols v. Walter et al.*, 37 Minn. 264, 33 N.W. 800. And the operation is uniform if it affects alike all persons in like situation. But where a statute operates upon a class, the classification must not be capricious or arbitrary and must be reasonable and pertain to some peculiarity in the subject matter calling for the legislation. As between the persons and places included within the operation of the law and those omitted,
> there must be some distinctive characteristic upon which a different treatment may be reasonably founded, and that furnishes a practical and real basis for discrimination. *Nichols v. Walter, supra.*"

¶ 2 The *Burks* test was very recently reaffirmed in *City of Enid v. Public Employees Relations Board*, 2006 OK 16, ¶ 15, 133 P.3d 281. There the question of what constituted a class for the purposes of determining whether a legislative enactment was a special law barred by the Oklahoma Constitution, art. 5, § 46 was considered. We said in ¶ 15:

> "Thus, in *Burks*, the Court created a two-part, rational-relationship test to determine whether a population-based classification was a special or general law. The Court has used this test in numerous cases involving constitutional challenges to population-based legislation under Okla. Const., art. 5, §§ 46 and 59."

In both *Burks* and *City of Enid*, the Court noted the application of the two-part test applied regardless of whether the classification is challenged under the Okla. Const. art. 5, §§ 46 or 59 or both. In *City of Enid*, the number of cities which fell into the classification was immaterial because the test for constitutionality is not numerical, but rather whether the classification is clearly capricious, arbitrary, and wholly unrelated to the Act. The same test applies here, also making the fact that there is only one ground water basin designated by the EPA as a "Sole Source Aquifer" wholly immaterial to the law's uniform operation throughout the state.[1]

---

1. To hold otherwise in *City of Enid* would have effectively nullified at least 51 population-based legislative enactments that regulate the affairs of counties, cities, towns, wards and school districts, some of which have been on the books since just after statehood. For statutes requiring the classification of cities, towns or counties by population, see e.g., 11 O.S. Supp.2004 § 28–101 (Creating a municipal criminal court of record in cities with population greater than 65,000.) [Predecessor statute declared valid as a general law in *Buchanan v. State*, 30 Okla.Crim. 362, 236 P. 903 (1924)]; 20 O.S.2001 § 1201 (County law libraries in counties of greater than 300,000 to be operated in accordance with rules promulgated by the Supreme Court.); 11 O.S.2001 § 27–104 (Prohibiting municipal judges in cities with population greater than 200,000 from otherwise practicing law.); 11 O.S.2001 § 44–103 (Requiring Board of Adjustment in cities with population over 200,000 to meet at least twice per month.); 11 O.S.2001 § 45–102 (Members of municipal planning commission in cities with population over 200,000 entitled to per diem.); 11 O.S.2001 § 29–203 (Size of volunteer fire departments set by population.); 11 O.S.2001 § 22–116 (Municipality with population of more than 350,000 has jurisdiction over all property within its limits belonging to the municipality, and may enact ordinances regulation real property it owns outside its corporate limits.); 2 O.S.2001 § 15–69 (Requiring board of directors of fair boards in counties with population of more than 55,000 to hold additional county fairs and stock shows.); 63 O.S.2001 § 1–203 (Setting minimum salary for county superintendent of health by popula-

tion of county.); 63 O.S.2001 § 1–210 (Creating city-county board of health in counties with population of more than 225,000, which contain at least one city of more than 150,000 people.); 62 O.S.2001 § 385 (Cities, counties, townships and school districts with population between 200,000 and 300,000 may pay bonds on which the statute of limitation has run.); 62 O.S.2001 § 331 (Requiring cities with more than 30,000 population to budget and levy for their Park Budget Account.); 51 O.S.2001 § 10 (Prohibiting appointments to fill vacant county offices only in counties with a population of more than 600,000.); 50 O.S.2001 § 42 (Defining allowed cemetery placements by population of nearest city, and exempting cities with population over 300,000 from statutory requirements where such a matter would be covered by a city planning commission.); 28 O.S.2001 § 1103.1 (Exempting counties with a population of more than 400,000 from hiring an executive director for economic development program.); 11 O.S.2001 § 16–302 (Municipalities with less than 1,000 population and no charter required to elect officers and consider initiative questions and biannual meeting, unless otherwise set of a regulation election.); 11 O.S. 2001 § 34–101 (Setting maximum number of hours a reserve police officer may work by the size of the municipality.); 12 O.S.2001 § 1206.1 (Excluding municipalities of less than 60,000 from having to contribute financially to the acquisition of rights-of-way for state highways.); 65 O.S.2001 § 158.1 (Limiting powers of library commission in counties with less than 200,000 persons.); 65 O.S.2001 § 4–206 (Setting minimum qualifications of librarians based on population of the county in which the library is located.); 65 O.S.2001 § 1–104 (Defining types of libraries by the population of their location.); 19 O.S.2001 § 11 (Minimum population for the creation of a new county.); 3A O.S.2001 § 207 (Municipalities with a population of less than 1,000 not to receive horse racing tax proceeds.); 11 O.S.2001 § 17–105 (Municipalities with more than $25,000 in income but less than 2,500 in population held to less stringent accounting standards then municipalities with more than 2,500 population.); 19 O.S.2001 § 215.36 (Requiring counties with more than 300,000 population to furnish District Attorney with equipment and personal to create a computer based microfilm service.); 19 O.S.2001 § 1202 (Defining "rural", for the purposes of the Rural Ambulance Service Districts Act, as a municipality with a population of less than 8,500.); 27A O.S.2001 § 2–5–103 (Requiring cities of less than 300,000 to obtain prior approval as to feasibility before enforcing stricter municipal clean air standards.); 27A O.S.2001 § 2–10–1001 (Approval of applications for a solid waste management station by counties with less than 20,000 population requires previous placement on a county plan.); 62 O.S. Supp. 2004 § 842 (Using county population to set formula for maximum amount of funds available to the county under the Oklahoma Local Development and Enterprises Zone Incentive Leverage Act.); 62 O.S. Supp.2005 § 856 (Using different funding formula under the Local Development

Act depending on whether or not the city has more or less than 50,000 population.); 62 O.S. Supp.2003 § 885 (Housing reinvestment districts may only be created in cities and counties with population of less than 300,000.); 62 O.S.2001 § 871 (Defining municipality for the purposes of the Oklahoma Rural Housing Incentive District Act as a city or town with a population of less than 40,000 in a county with a population of less than 75,000.); 62 O.S.2001 § 2102 (Defining community for the purposes of the Industrial Facilities Development Act as a county, city, town or place with a population of less than 7,000.); 11 O.S. Supp.2004 § 2–104 (Making population classification for the purposes of determining what territory may be created in a plat for a new municipality.); 11 O.S. Supp.2004 § 3–101 (Requiring petition for a new town to contain "the appropriate documentation to prove the territory within five miles of the corporate limits of a municipality having a population of more than 200,000 has historically been identifies as a community of people residing in compact form".); 2 O.S.2001 § 15–113 (Requiring city of 20,000 or more to have representation on county fair board.); 63 O.S. Supp.2005 § 2843.1 (Providing for suspending the collection of the required wireless 911 fee in counties with a population of less than 30,000 where the public agency has not yet deployed service.).

For statutes *permitting. but not requiring*, different action based on a population classification. See e.g., 11 O.S.2001 § 39–103.1 (Permitting, but not requiring, municipalities with a population greater than 1,500 to create and levy for improvement districts.);19 O.S. Supp.2004 § 339.6 (Permitting, but not requiring, only commissioners in counties with a population greater than 500,00 to set a juvenile curfew to apply to unincorporated areas of the county.); 11 O.S. 2001 § 13–101 (Permitting, but not requiring cities or towns with a population equal to or greater than 2,000 to frame a charter.); 10 O.S. 2001 § 1050A (Authorizing the appointment of an assistant juvenile officer only in those counties having a population between 24,000 and 40,000.); 18 O.S.2001 § 1324.2 (Defining "rural area" for the purposes of the Rural Water, Sewer, Gas and Solid Waste Management Districts Act as an area that "may" include portions of a corporate limit of any municipality having a population of less than 10,000.); 20 O.S.2001 § 1304A (Permitting, but not requiring, the district courts in counties with a population of greater than 200,000 to publish their dockets in a daily newspaper paid for by the court fund.); 19 O.S.2001 § 951 (Authorizing counties with a population of greater than 3000,000 to create a county retirement system.); 19 O.S.2001 § 941 (Authorizing counties with a population of greater than 300,000 to install and operate county parking lots.); 19 O.S.2001 § 565.1 (Authorizing county sheriff in counties with a population of greater than 40,000 to establish and operate a bureau of identification.); 68 O.S. Supp.2002 § 1370.9 (Permitting only counties with a population of less than 200,000 to levy a lodging tax

OPALA, J., dissenting.

¶ 1 The court upholds groundwater legislation enacted in 2003 [1] as free from state and federal constitutional taint. I recede from today's pronouncement for two reasons: (1) there is here no record trail that the dispositive threshold issue of standing was ever considered and expressly passed upon in advance of the statute's judicial testing for constitutional orthodoxy, and (2) the court's opinion impermissibly extends the text and outer sweep of the challenged statute **before** subjecting its expanded contours to constitutional testing. In this public-law controversy I would first afford the trial court its missed opportunity to cure the deficiency (in the record) by exploring and deciding the standing issue **before** any other issue is reached on review.

of up to 5%.); 20 O.S.2001 § 1202 (Law library trustees in counties with a population of greater than 300,000 authorized to suspend or change the amount of payments to the State Law Library Revolving Fund.); 19 O.S.2001 § 547 (Setting maximum number of hours county reserve sheriffs may work by population of the county.); 19 O.S.2001 § 645 (Town or city having less a population of less than 5,000 may designate county treasurer has the official treasurer of the town or city.); 11 O.S. Supp.2004 § 36–113 (Board of County Commissions may construct, improve, repair or maintain streets in municipalities having population of less that 5,000, and in municipalities of less than 15,000 if the county has a sales tax earmarked for road repair.); 11 O.S.2001 § 37–223 (Municipalities of less than 2,500 may pay for their share of school assessments with building bonds or the proceeds of a building tax levy.); 19 O.S. Supp.2004 § 215.30 (Counties with population of 400,000 or more permitted to supplement the county District Attorney's salary.).

It arguably would have voided at least an additional 19 statutes in which the legislature has made a distinction based on population for the purpose of facilitating state services through counties or cities. See e.g., 17 O.S.2001 § 40.1 (Corporation Commission required to establish a regional office in each municipality having a population greater than 250,000); 68 O.S. Supp. 2005 § 2887 (Exempting retirement communities in municipalities with a population of greater than 500,000 from the payment of ad valorem taxes.); 19 O.S.2001 § 866.1 (Counties in which there is no city of more than 200,000 may created a county planning and zoning commission.); 74 O.S.2001 § 2901.2 (Providing that between 65% and 75% of the expenditures from the Oklahoma Housing Trust Fund shall be made in counties with a population of less than 490,000.); 75 O.S. Supp.2004 § 503 (Requiring the Governor and Lt. Governor to each appoint a member of the small business regulatory committee from municipalities with a population of 300,000 or more, and the President Pro Tempore of the Senate and the Speaker of the House to each appoint one member from municipalities with a population of less than 300,000.); 74 O.S.2001 § 5013.2 (Giving preference in the expenditure of funds from the Minority Business Development Program Fund to applicants with an ability to aid minority owned businesses located in communities with populations of less than 10,000.); 74 O.S.2001 § 910 (Requiring all counties with a population of less than 400,000 to become a participating employer in the Oklahoma Public Employees Retirement System no later than January 1, 1974.); 74 O.S.2001 § 480 (Creating seats on the Advisory Committee on Intergovernmental Relations which may only be filled by officers from municipalities meeting certain population requirements.); 69 O.S.2001 § 316 (Including all roads within the incorporated limits of a municipality with a population of less than 2,500 in the certification of county road mileage.); 68 O.S. Supp.2005 § 3604 (Permitting municipalities with a population of less than 100,000 to receive up to 25% of the amount of a payment to a qualified establishment in the municipality under the Oklahoma Quality Jobs Program Act.); 68 O.S.2001 § 706 (Portioning special fuel tax revenue by population.); 68 O.S. 2001 § 500.7 (Apportioning diesel fuel tax revenue by population.); 68 O.S.2001 § 500.6 (Apportioning gasoline tax revenue by population.); 36 O.S.2001 § 6220.1 (Adjusters in municipalities with less than 6,000 population are not prohibited from having pecuniary interest in entity providing reconstruction services.); 47 O.S. Supp.2005 § 1140 (Classifying counties and municipalities by population for purposes of placing motor vehicle agents.); 59 O.S. Supp.2004 § 567.4 (Requiring at least members of the Oklahoma Nursing Board to be from counties with less than 40,000 population.); 63 O.S. Supp.2004 § 142.4 (Municipalities of less than 3,000 population exempt from filing fees under the Underground Facilities Damage Prevention Act.); 19 O.S.2001 § 901.57 (Calculating formula for the distribution of funds under the Rural Fire Protection Program Fund Act by population.).

1. The challenged groundwater legislation is 82 O.S.Supp.2003 §§ 1020.9A, 1020.9B, 1020.9(A)(1)(d), (2)(d).

# I

## THE COURT HAS FAILED TO DIRECT THAT A TRIAL COURT'S DISPOSITION OF THE THRESHOLD STANDING ISSUE BE SECURED BEFORE THE GROUNDWATER LAW IS TESTED FOR CONSTITUTIONAL ORTHODOXY

¶ 2 We cannot reach the alleged infirmity of the challenged 2003 groundwater legislation in advance of a showing that the trial court considered and passed upon two separate challenges to the plaintiffs' standing.[2] These **challenges** were made at different stages of summary process. The **first** was pressed at the **pre-intervention stage** when the defendants (Water Board and Duane Smith) moved to dismiss.[3] The **second** was interposed by the intervenors.[4]

2. Standing must be predicated on cognizable economic harm. *Public Service Co. of Oklahoma v. Northeastern Oklahoma Elec. Co-op., Inc.,* 2002 OK 29, ¶ 6, 49 P.3d 80, 82; *Oklahoma Gas & Elec. Co. v. Oklahoma Elec. Coop., Inc.,* 1973 OK 158, ¶ 12, 517 P.2d 1127, 1132. The plaintiff must show that he in fact suffered injury to a legally protected interest. A person who seeks to invalidate a statute as unconstitutional must establish standing by showing that the legislation sought to be invalidated detrimentally affects his/her interest in a direct, immediate and substantial manner. *Public Service Co. of Oklahoma v. Northeastern Oklahoma Elec. Co-op., Inc., supra* at ¶ 6, 49 P.3d at 82; *Hendrick v. Walters,* 1993 OK 162, ¶ 4, 865 P.2d 1232, 1237; *Independent School Dist. No. 9 v. Glass,* 1982 OK 2, 639 P.2d 1233, 1237; *Matter of Estate of Doan,* 1986 OK 15, ¶ 7, 727 P.2d 574, 576.

3. The **defendants moved for dismissal** on three grounds: (1) the case does not present a justiciable controversy and is not ripe; (2) the plaintiffs fail to state a claim against Duane Smith upon which relief can be granted; (3) **Roos Resources, Inc. lacks standing to challenge SB288. They urged plaintiffs' claim was premature because** (a) the legislation had not yet become effective, (b) the temporary permits' revalidation would not occur until six months later, at which time the plaintiffs may not even hold temporary permits or choose to revalidate them and (c) plaintiffs did not allege there were any actual contracts for the sale of groundwater which would be impacted. The trial court heard the defendants' motion on **25 September 2003**; the order denying the dismissal quest was entered **6 October 2003** (see *infra* note 7). It makes no explicit mention of the challenge to standing.

4. Municipalities and Citizens For The Preservation Of The Arbuckle–Simpson Aquifer (CAPSA) were granted leave to intervene **3 October 2003**. Standing was affirmatively challenged in the intervenors' answers and was clearly implicated in a response to the plaintiffs' motion for summary judgment. The Intervenors/municipalities' answers to plaintiffs' petition state as an affirmative defense:

The Plaintiffs lack standing to bring this cause of action

AFFIRMATIVE DEFENSES* * *
17. Plaintiff Jacobs Ranch, LLC is an improper party and has no standing to bring this action in that Jacob's Ranch, LLC holds no permits issued by the Defendant, OWRB nor does it own any land based on which it can apply for an OWRB permit.
Plaintiff Roos Resources, Inc. is an improper party and has no standing to bring this action because it holds no permits issued by Defendant OWRB.
* * *
26. Since Plaintiffs are either permit holders or not qualified to become applicants for Arbuckle–Simpson ground water permits, Plaintiffs lack standing to assert Senate Bill 288 is unconstitutional with respect to applicants for groundwater permits.
CAPSA's cross motion for partial summary adjudication states:
12. Plaintiffs' twelfth statement of fact is objected to as incorrect and misleading and is denied. Plaintiffs' own papers show that Plaintiffs do not hold temporary, revocable permits to use groundwater for various municipal and light industrial purposes. Instead, Exhibits B and I to the Plaintiffs motion indicate that only Jacobs Enterprises holds interest in any temporary permits. It appears from the Plaintiffs own papers that they do not hold an interest in any of the permits that are claimed to have been interfered with.
Plaintiffs have made and can make no demonstration that they will suffer economic injury as a result of the implementation of S.B. 288. The regulation of the use of ground water does not constitutionally infringe upon landowners' vested property rights.
As even the Plaintiffs acknowledge, they must first obtain a permit from the Oklahoma Water Resources Board before using water for any non-domestic purpose. Though it is claimed, some, if not all of the Plaintiffs actually do not own a permit to use groundwater from the Arbuckle Simpson Aquifer nor do they have any contract to sell the water to anyone.
Even though intervenors made this assertion in the context of pressing another theory, in public-law litigation this court is duty-bound to supply the correct legal norm. If this fact issue be resolved in intervenors' favor, it would be dispositive of plaintiffs' claim for declaratory relief.

¶ 3 Standing, which presents here a threshold question, cannot be " 'inferred argumentatively from averments in the pleadings'[5] but rather 'must affirmatively appear in the record.' "[6] Because standing will not be presumed from a silent record, we look to the paper trail of a meaningful nisi prius inquiry that would reveal the issues of law or fact, or both, that were inquired into and resolved below. There must be a record trail of an express judicial finding of standing in a judge-signed journal entry.

¶ 4 **There is here absolutely no paper trail of any kind that informs us of the decisional process employed in disposing of the standing issue.** The trial court may have indeed denied the dismissal quest, but its order does not squarely and expressly address itself to the standing challenge.[7] There is no express mention in the order disposing of the **first challenge** that affirmatively deals with that issue or enlightens us **on whether standing presents an issue of law or fact, or both.** In none of the trial court's orders is there an entry that addresses itself to the **second standing challenge.**[8]

In short, there is no record trail shedding any light on the judicial inquiry conducted below into the standing issue and into the extent of that inquiry with respect to either facts or law.

¶ 5 The court appears to regard as amply sufficient a trial court's **implied** disposition of the standing issue in contrast to an **express** on-the-record decision that would give an appellate court some insight into the nature and extent of the conducted inquiry. **There is here no need for today's rush to judgment in advance of proper standing resolution.**[9] This court should not be reaching any of the pressed constitutional issues without first being assured of an affirmative on-the-record trial-court decision in response to a standing challenge. Because the two consecutive challenges made below to plaintiffs' standing present, on this record, an unresolved threshold issue, the cause should be remanded for an in-depth inquiry and determination by the first-instance court.

¶ 6 The requirement of standing is at the heart of the court's inquiry into its power to

*Amos v. Spiro Public Schools*, 2004 OK 4, ¶ 7, 85 P.3d 813, 816.

5. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990) (quoting *Grace v. American Central Ins. Co.*, 109 U.S. 278, 284, 3 S.Ct. 207, 210, 27 L.Ed. 932 (1883)).

6. *FW/PBS, Inc. v. City of Dallas*, supra note 5, 493 U.S. at 231, 110 S.Ct. at 608 (quoting *Mansfield C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884)).

7. The trial court's order states:

 Having considered Defendants' Motion to Dismiss and Brief in Support, Plaintiffs' Brief in Opposition to Motion to Dismiss, and Defendants' Reply Brief in Support of Defendants' Motion to Dismiss, and the additional arguments presented by respective counsel at the hearing, the Court HEREBY ORDERS AND DECREES that Defendants' Motion to Dismiss is DENIED.

8. Even if the trial court's order had specifically dealt with the standing issue, there is no legal ground for prohibiting later-included parties from challenging standing as an affirmative defense. They are entitled to a "full and fair opportunity" to litigate this threshold issue before a decision on the merits.

9. The prudential rule of necessity, adhered to by all state and federal courts, commands that constitutional issues not be resolved in advance of strict necessity. This *sine qua non* principle of constitutional judicature is plainly ignored and patently offended today. *In re Snyder*, 472 U.S. 634, 642–43, 105 S.Ct. 2874, 2880, 86 L.Ed.2d 504 (1985); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936)(Brandeis, J., concurring); *State ex rel. Fent v. State ex rel. Okla. Water Res. Bd.*, 2003 OK 29, ¶ 12, 66 P.3d 432, 439.
"Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.... A closely related principle is **that constitutional rights are personal and may not be asserted vicariously.... These principles rest on more than the fussiness of judges.** They reflect the conviction that **under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws.** Constitutional judgments ... **are justified only out of the necessity of adjudicating rights** in particular cases between the litigants brought before the Court." *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973)(emphasis added, citations omitted).

entertain the litigation before it.[10] It closely follows an inquest into its own jurisdiction. To accept as a sufficient record the tersely worded entries in the memorials, as the court does today, would relegate the mandatory standing inquiry to the exclusive concern of the trial courts and leave nothing for reviewing tribunals but to rubber stamp the lower court's decision in cases, such as this one, in which the presence of standing appears to be satisfied only to the court of first instance. I would not abdicate this court's reviewing responsibility **by accepting as final and irreversible** the trial court's resolution of that threshold issue.

¶ 7 Standing must be satisfied whether the parties call it to the court's attention or not.[11] Even if the parties fail to raise the issue, standing's factum cannot be drawn from vacuity. The court has an obligation to pursue the inquiry *sua sponte* until it is satisfied that the plaintiffs meet the law's test. In the absence of a re-inquiry into standing on an adequate record, I cannot and do not join today's pronouncement insofar as it resolves constitutional attacks in advance of strict necessity.[12] Moreover, when resolving a question of public law, it is this court's duty to invoke *sua sponte* the correct legal norms that are dispositive of the issues pressed on review.[13]

¶ 8 In short, the microscopic nisi prius record references the court is relying on

today fall short of satisfying the unique nature of the question we are obliged to inquire into before passing on the constitutional orthodoxy of the statutes attacked for fundamental-law infirmity. The record trail relied on by the court today does not afford the means of discharging our duty to revisit the factum of standing.

¶ 9 Confronted, as we are, by the record's total silence, I would reverse summary judgment and (a) give both parties an opportunity to re-present the unresolved threshold issue and secure its meaningful disposition upon full inquiry and (b) afford the trial court the opportunity to cure the deficiency now in the record by expressly reaching and deciding the plaintiffs' standing in advance of resolving all other issues.

## II

### TODAY'S PRONOUNCEMENT IMPERMISSIBLY STRETCHES THE STATUTE'S TEXT THAT IS TO BE TESTED FOR CONSTITUTIONAL FLAWS

¶ 10 I strongly reject today's judicial stretching of the text of the challenged groundwater legislation. An appellate court commits grave error by extending the scope of the law to a statewide dimension without any warrant in its language and then testing it for the presence of constitutional flaws.[14]

---

10. Standing inquiry must be affirmatively resolved at nisi prius to ensure that the litigation was properly brought before the trial tribunal. *Toxic Waste Impact Group, Inc. v. Leavitt*, 1994 OK 148, ¶ 1 n. 1, 890 P.2d 906, 910–11; *Oklahoma Public Employees Ass'n v. Oklahoma Dept. of Central Services*, 2002 OK 71, ¶ 21, 55 P.3d 1072, 1081; *see also Dover Historical Soc. v. City of Dover Planning Com'n*, 838 A.2d 1103, 1110 (Del.Supr.2003).

11. *Matter of Estate of Doan, supra* note 2, at ¶ 7, at 576.

12. *Ashwander v. Tennessee Valley Authority, supra* note 9, 297 U.S. at 347, 56 S.Ct. at 483 (Brandeis, J., concurring); *Broadrick v. Oklahoma, supra* note 9, 413 U.S. at 610–11, 93 S.Ct. at 2915.

13. *Burdick v. Independent School Dist. No. 52 of Oklahoma Cty.*, 1985 OK 49, ¶ 8, 702 P.2d 48, 54; *McCracken v. City of Lawton*, 1982 OK 63, ¶ 9, 648 P.2d 18, 21; *Application of Goodwin*, 1979

OK 106, ¶ 2, 597 P.2d 762, 764. In public-law litigation, into which this appeal falls, this court rather than the parties may choose *sua sponte* the issues dispositive of the appeal. *Amos v. Spiro Public Schools, supra* note 4, at ¶ 7, at 816.

Standing may be raised *sua sponte* in a public-law controversy as an issue at any stage of the judicial process by any party or by the court. *Hendrick v. Walters, supra* note 2, 865 P.2d at 1236. Once raised it must be resolved in advance of the trial court's decision on the merits. *Oklahoma Public Employees Association v. Oklahoma Dept. Of Central Services, supra* note 10, at ¶ 21, 55 P.3d at 1080; *Toxic Waste Impact Group, Inc. v. Leavitt, supra* note 10, at ¶ 9, 890 P.2d at 911.

14. This court may not, under the guise of construction, extend, enlarge or otherwise change the terms of a statute. Where the statute is plain and unambiguous, there is no room for judicial construction that would extend its ambit beyond the scope of the plain and unambiguous lan-

¶ 11 The statute does not appear to apply beyond a single aquifer—the Arbuckle–Simpson Groundwater Basin.[15] Its terms target only "sensitive sole source" groundwater basin.[16] At the time of the statute's passage, the Arbuckle–Simpson was the only major groundwater basin in the state which had been designated as a sole-source aquifer.

¶ 12 Today's search for constitutional orthodoxy attributes to the challenged statute a general application to all aquifers (in the state) by invoking no more than pure thin air for the pedestal of the statute's textual extension.

### III

### SUMMARY

¶ 13 I would counsel the court to defer its pronouncement until the standing issue has been thoroughly explored and decided below. Standing has been raised by the defendants and intervenors, but there is no clear record trail of its nisi prius disposition which would inform us about that issue and would tell us whether it poses an issue of fact or law, or both. An affirmative decision on standing's presence cannot be drawn by implication or from mere silence, but must be shown by an affirmative on-the-record ruling.

¶ 14 I would not make today's pronouncement on the several important constitutional challenges in reliance upon a judicial stretching of the statute's text that is facially confined to a single aquifer.

guage. *Hammock v. U.S.*, 2003 OK 77, ¶ 10, 78 P.3d 93, 97; *Arrow Tool & Gauge v. Mead*, 2000 OK 86, ¶ 15, 16 P.3d 1120, 1125–26; *Sisney v. Smalley*, 1984 OK 70, ¶ 17, 690 P.2d 1048, 1051.

15. The contested groundwater law affects the plaintiffs' present right to withdraw water from the Arbuckle–Simpson Groundwater Basin for municipal or public water supply use outside of the five counties overlying the groundwater basin.

16. The challenged legislation imposes two moratoria (a) one on the Oklahoma Water Resources Board's issuance of temporary permits for the withdrawal of groundwater for municipal or

public water supply use outside of any county overlying a **"sensitive sole source"** groundwater basin and (b) the other on municipalities and other political subdivisions (located outside of any county overlying that basin) contracting to transport water from a sole-source aquifer for municipal or public-water supply use. The term "sensitive sole source groundwater basin or sub-basin" is defined by the legislation as any major groundwater basin that has been designated as a sole-source aquifer by the United States Environmental Protection Agency (EPA). 82 O.S.Supp. 2003 §§ 1020.9A, 1020.9B, 1020.9(A)(1)(d). **At the time of the contested law's passage, the Arbuckle–Simpson was the only major groundwater basin in the state which had been designated by the EPA as a sole-source aquifer.**