OSCN Found Document:BRISCO v. GERARD

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 BRISCO v. GERARD
2023 OK CIV APP 19
530 P.3d 75
Case Number: 119331
Decided: 04/12/2022
Mandate Issued: 05/18/2023
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV

Cite as: 2023 OK CIV APP 19, 530 P.3d 75

 

ROCHELLE BRISCO, as Special Administrator of the Estate of Christopher Jesse Curtis Cooper, Deceased, Plaintiff/Appellant,
v.
TERRY R. GERARD, II, D.O.; DURANT H.M.A., LLC d/b/a AllianceHealth Durant, an Oklahoma Limited Liability Company; MENTAL HEALTH SERVICES OF SOUTHERN OKLAHOMA, INC. d/b/a Mental Health Services of Southern Oklahoma, an Oklahoma Not For Profit Corporation, Additional Defendants.

THE OKLAHOMA MENTAL HEALTH COUNCIL d/b/a Red Rock Behavioral Health Services, an Oklahoma Not For Profit Corporation; and RACHEL J. DALTHORP, M.D., Defendants/Appellees,

APPEAL FROM THE DISTRICT COURT OF
OKLAHOMA COUNTY, OKLAHOMA

HONORABLE DON ANDREWS, TRIAL JUDGE

AFFIRMED

Joseph T. Acquaviva, Jr., WILSON, CAIN & ACQUAVIVA, Oklahoma City, Oklahoma,
David Bernstein, BERNSTEIN LAW FIRM, Oklahoma City, Oklahoma, and
John E. Vitali, Brice W. Bisel, HORNBEEK VITALI & BRAUN, P.L.L.C., Oklahoma City, Oklahoma
for Plaintiff/Appellant

D. Todd Riddles, Tyler J. Coble, CHEEK LAW FIRM, P.L.L.C., Oklahoma City, Oklahoma, for Defendant/Appellee Mental Health Services of Southern Oklahoma

Russell L. Hendrickson, Hailey M. Hopper, PIERCE, COUCH, HENDRICKSON, BAYSINGER AND GREEN, L.L.P., Oklahoma City, Oklahoma, for Defendant/Appellee Rachel J. Dalthorp, M.D.

Eddie L. Carr, HOLDEN LITIGATION, HOLDEN, P.C., Tulsa, Oklahoma, for Defendant The Oklahoma Mental Health Council d/b/a Red Rock Behavioral Health Services

STACIE L. HIXON, PRESIDING JUDGE:

¶1 Rochelle Brisco (Brisco), as Special Administrator of the Estate of Christopher Jesse Curtis Cooper (Cooper), appeals the district court's February 12, 2020 Amended Journal Entry of Judgment, granting summary judgment in favor of Dr. Rachel J. Dalthorp (Dr. Dalthorp) and the August 24, 2020 Journal Entry of Judgment granting summary judgment in favor of Red Rock Behavioral Health Services (Red Rock).[1] The primary issue is whether the undisputed material facts show there was no physician-patient relationship between Dr. Dalthorp and Cooper, and therefore, she owed no duty to him and was not negligent as a matter of law. Based on our review of the record and applicable law, we find the undisputed facts showed no physician-patient relationship was established, and we affirm both orders granting summary judgment in favor of Dr. Dalthorp and Red Rock.

BACKGROUND

¶2 Cooper, who was a truck driver, and Jessica Rupe, his significant other, were stopped at a Love's Travel Stop in Colbert, Oklahoma on July 2, 2015. At around 12:45 p.m., Rupe called 911 and stated that Cooper was suicidal, not making sense, and having a Post-Traumatic Stress Disorder episode. Jeffrey Goerke, Chief of Police of the Colbert Police Department, responded to the call and eventually took Cooper to the hospital (AllianceHealth).[2]

¶3 At the hospital, Cooper was initially examined by a Physician's Assistant, Ashley Thomann, though he was uncooperative and would not talk or answer questions. A urine analysis was also conducted, and Cooper tested positive for amphetamines. Mija Stowe, a case manager for MHSSO, performed an in-person screening of Cooper, after which she was required by policy to contact a mental health professional. Accordingly, Stowe contacted Kelli Simpson, a licensed mental health professional, to perform an assessment of Cooper via a video teleconferencing system. After the assessment, Stowe called Simpson to discuss the patient and decide on a plan of action. It was Stowe's understanding that Cooper was going to be placed under an emergency order of detention. Accordingly, she attempted to locate a bed for Cooper in a mental health facility by calling Red Rock.

¶4 Dr. Dalthorp was a contract physician with Red Rock, taking calls from her home to evaluate whether individuals should be admitted into the facility. Eventually, Dr. Dalthorp, spoke over the telephone with P.A. Thomann. Dr. Dalthorp declined the transfer from the hospital to Red Rock because Cooper's symptoms were typical of methamphetamine-induced psychosis, and she was unable to differentiate between methamphetamine intoxication and schizophrenia at that time based on the information given to her. Dr. Dalthorp then advised Red Rock triage that she would not be accepting Cooper for transfer to the facility at that time. It was undisputed that Dr. Dalthorp did not advise P.A. Thomann to discharge Cooper from the hospital.

¶5 Subsequently, Cooper was released from the hospital. P.A. Thomann admitted she was free to exercise her own medical judgment in determining how Cooper was treated, and she made the final determination to discharge him from the hospital. After his release from the hospital, Cooper was returned to his truck at Love's. In the parking lot, an incident occurred between Cooper and another truck driver, Ricky Morris, and his wife, Sharon Morris. The Morrises left the parking lot. Then, Cooper stole a semi-truck at knife point and chased the Morrises. After forcing the Morrises to pull over, Cooper attempted to stab Mr. Morris. Ultimately, Ms. Morris retrieved a handgun from the back of the truck and shot Cooper, resulting in his death.

¶6 Brisco filed suit on November 29, 2018 against multiple defendants. As relevant to the present appeal, she alleged Dr. Dalthorp was negligent in her care of Cooper and that Red Rock was vicariously liable for Dr. Dalthorp's alleged negligence. Dr. Dalthorp later filed a motion for summary judgment, to which Brisco responded, alleging there was no physician-patient relationship between her and Cooper that would give rise to a duty to support a negligence cause of action. The district court held a hearing and found no said relationship existed as a matter of law and granted Dr. Dalthorp's motion. The order was filed on February 12, 2020. Red Rock subsequently filed a motion for summary judgment, to which Brisco responded by incorporating its previous briefing, arguing that because the court found Dr. Dalthorp was not negligent as a matter of law, Red Rock could not be found vicariously liable. The district court then granted Red Rock's motion and filed its order of August 24, 2020.

¶7 Brisco appeals from these two orders.

STANDARD OF REVIEW

¶8 Whether summary judgment was properly entered is a question of law, reviewable de novo. Payne v. Kerns, 2020 OK 31, ¶ 10, 467 P.3d 659. Under de novo review, we have "plenary, independent and non-deferential authority to determine whether the trial court erred in its application of the law and whether there is any genuine issue of material fact." Id.

¶9 Summary judgment will be affirmed only if the Court determines that there is no dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Lind v. Barnes Tag Agency, 2018 OK 35, ¶ 9, 418 P.3d 698. All inferences and conclusions to be drawn from the materials must be viewed in a light most favorable to the non-moving party. Id.

ANALYSIS

¶10 Brisco alleges the trial court erred by granting Dr. Dalthorp's motion for summary judgment. As with other negligence actions, the elements of a medical malpractice action are: (1) a duty of care owed by the defendant to the plaintiff, (2) a breach of that duty, (3) an injury, and (4) causation. Jennings v. Badgett, 2010 OK 7, ¶ 12, 230 P.3d 861. In other words, the plaintiff must show that the defendant breached a duty owed to the plaintiff that caused the injuries. Id. The issue of the existence of duty is a question of law for the court. Id. If the defendant did not owe a duty of care to the plaintiff, there can be no liability for negligence as a matter of law. Lowery v. Echostar Satellite Corp., 2007 OK 38, ¶ 12, 160 P.3d 959.

¶11 Moreover, an action for malpractice is based on an employment contract between the patient and the physician. Jennings, 2010 OK 7, at ¶ 13. In Oklahoma, a physician is not under a general duty to provide professional services to others; rather, the physician must consent to provide the services. Id. (citing Jackson v. Mercy Health Center, Inc., 1993 OK 155, ¶ 5, 864 P.2d 839). Accordingly, the Oklahoma Supreme Court has found that in a medical malpractice action, the plaintiff must prove a physician-patient relationship to establish the defendant owed a duty. Id. at ¶ 27. Unlike the question of duty, the question of the formation of a physician-patient relationship is one of fact, turning on a determination of whether the patient entrusted his treatment to the physician and whether the physician accepted the case. Id. at ¶ 18. However, on a motion for summary judgment when the material facts are undisputed and the evidentiary materials and facts show one party is entitled to judgment, the court may decide the issue as a matter of law. Id.

¶12 In Jennings, the plaintiffs sued multiple defendants, including Dr. Schlinke, for the alleged negligent delivery and treatment of their daughter at the time of her birth. Id. at ¶ 2. The undisputed facts showed that the treating physician merely called Dr. Schlinke seeking his opinion, which the physician then incorporated into his decision on how to care for the mother. Id. at ¶ 9. The undisputed facts further showed Dr. Schlinke did not render medical advice to the plaintiffs; did not provide services to the treating physician on behalf of the baby or her mother; took no affirmative action to treat the baby or her mother; spoke only with the treating physician and not to either of the parents; did not examine the baby or her mother; did not receive a referral for treatment or consultation; was not employed by the treating physician and had not been asked or contracted by such physician to provide medical treatment to the child or her mother; and had not reviewed any work, conducted any laboratory tests, reviewed any test results, prepared any reports, or billed the plaintiffs. Id. at ¶ 25. Moreover, none of the plaintiffs agreed that Dr. Schlinke could treat either the baby or her mother, and even though the treating physician chose to rely on Dr. Schlinke's opinion, the treating physician was free to exercise his independent judgment. Id.

¶13 Given these facts, the Court found there was not the physician-patient relationship necessary for a medical malpractice action, and the district court correctly granted judgment in Dr. Schlinke's favor. Id. at ¶ 26. The Court held that a telephone conversation between a non-treating physician and the treating physician concerning the patient, without more, is insufficient to establish a physician-patient relationship--even when the treating physician relies on the non-treating physician's opinion. Id. at ¶ 27.

¶14 In the present case, the undisputed facts show that at the time Cooper was in the hospital, Dr. Dalthorp was a contract physician with Red Rock, taking calls from her home to evaluate whether individuals should be admitted into the facility.[3] In speaking with P.A. Thomann, Dr. Dalthorp testified that her sole intent was to determine whether or not to accept the transfer of Cooper to Red Rock.[4] Brisco admits that the purpose of the phone call was to "evaluate Cooper for admission to Red Rock." During the phone call, Dr. Dalthorp determined that Cooper did not meet the admission criteria because he appeared to be intoxicated on methamphetamine based on the presence of amphetamines in his urine analysis, and she could not determine whether he was intoxicated or schizophrenic. Accordingly, Dr. Dalthorp declined the transfer from the hospital to Red Rock, and then advised Red Rock triage that she would not be accepting Cooper for transfer to the facility at that time. After declining the transfer, Dr. Dalthorp had no further interaction with Cooper's health care providers at AllianceHealth, and she had no indication of what those health care providers would do next regarding Cooper's care. P.A. Thomann admitted she was free to exercise her own medical judgment in determining how Cooper was treated, and she made the final determination to discharge him from the hospital.

¶15 Furthermore, it is undisputed that Dr. Dalthorp never agreed to enter into a physician-patient relationship with Cooper. At no time did she accept Cooper as a patient, agree to treat him or actually treat him, or even talk to him. She did not personally evaluate, examine, or consult him, did not provide him with medical advice, and did not agree to co-manage his care, or charge for professional services. Given these undisputed facts, we find the trial court properly granted summary judgment to Dr. Dalthorp. It follows that because Dr. Dalthorp was not negligent as a matter of law, Red Rock could not be held vicariously liable. Thus, we find the trial court also properly granted summary judgment to Red Rock.

¶16 Brisco essentially argues that Dr. Dalthorp had a duty to use ordinary care in determining whether to accept Cooper for admission to Red Rock, and that she breached such duty by declining admission. We find no binding authority imposing such a duty. Rather, Jennings provides that there is no general duty for a physician to provide professional services, and a duty of care only arises when the patient-physician relationship has been established. To hold that Dr. Dalthorp owed a duty to exercise care in determining whether to admit Cooper to Red Rock i.e., accept him as a patient, extends her duty beyond that recognized by the Supreme Court in Jennings. The fact that Dr. Dalthorp obtained information from P.A. Thomann to determine whether Cooper met Red Rock's admission criteria, and explained to P.A. Thomann why he did not meet the admission criteria, does not establish the formation of a physician-patient relationship, when Dr. Dalthorp specifically declined to accept him as a patient at Red Rock.[5]

 

¶17 Brisco also argues P.A. Thomann was acting as Cooper's surrogate; therefore, Dr. Dalthorp's conversation with her acted to establish a physician-patient relationship with Cooper. Brisco relies on the definition of the physician-patient relationship promulgated by the State Board of Medical Licensure and Supervision after the Jennings decision, which states such relationship may be established by "direct or indirect contact with a patient . . . ." See O.A.C. 435:10-1-4. The term "patient" means "the patient and/or patient surrogate." Id. The following definition is provided for "surrogate":

 

"Surrogate" means individuals closely involved in patients' medical decision-making and care and include:

(A) spouses or partners;
(B) parents;
(C) guardian; and
(D) other individuals involved in the care of and/or decision-
making for the patient.

Id.

¶18 Brisco, however, provides no evidentiary materials indicating P.A. Thomann was acting as Cooper's surrogate within the meaning of O.A.C. 435:10-1-4.[6] Brisco also implies that a physician-patient relationship arose because Dr. Dalthorp's approximately four-minute conversation with P.A. Thomann somehow constituted a mental health evaluation of Cooper pursuant to 43A O.S.2011, §§ 5-206, 5-208. Even considering the undisputed facts in the record in the light most favorable to Brisco, we find Dr. Dalthorp was not conducting a mental health evaluation of Cooper. She was simply determining whether Red Rock would accept him as a patient. Given he was declined acceptance to the facility, we remain convinced that no physician-patient relationship was established between Dr. Dalthorp and Cooper as a matter of law.

CONCLUSION

¶19 Accordingly, we affirm the district court's February 12, 2020 and
August 24, 2020 orders granting summary judgment in favor of Dr. Dalthorp and Red Rock, respectively.

¶20 AFFIRMED.

RAPP, J., concurs, and FISCHER, V.C.J., dissents.

FOOTNOTES

[1] The district court also filed an Order Granting Summary Judgment to Dr. Terry R. Gerard, II (Dr. Gerard); Durant H.M.A., LLC, d/b/a AllianceHealth Durant (AllianceHealth); and Mental Health Services of Southern Oklahoma, Inc., d/b/a Mental Health Services of Southern Oklahoma (MHSSO) on December 22, 2020. Such order is the subject of the companion case no. 119,332.

[2] The hospital was formerly called the Medical Center of Southeastern Oklahoma.

[3] Brisco never argued that Cooper was a third-party beneficiary of Dr. Dalthorp's contract with Red Rock. Dicta in Jennings indicates the Supreme Court would recognize that in a negligent delivery/prenatal care case, an infant may be the third-party beneficiary of an employment contract between the mother and the physician. See id. at ¶ 17. However, Jennings does not indicate a patient may be a third-party beneficiary of a contract for services between a physician and a hospital.

[4] Brisco denies several of Dr. Dalthorp's proposed undisputed facts "as worded" yet failed to produce evidentiary material to support her denial. Such unsupported denials are insufficient to warrant a trial on the issues. See Lowery, 2007 OK 38, at ¶ 16 ("When, on summary judgment, the defendant contends that the facts and circumstances are undisputed and submits evidentiary material supporting the contention, the plaintiff must respond with some evidentiary material that would demonstrate a need for a trial on the issue.").

[5] In any event, even if Dr. Dalthorp somehow owed a duty to Cooper, the undisputed facts show she was not the cause of his injuries because it is uncontroverted that Dr. Dalthorp did not recommend Cooper's discharge from AllianceHealth, and this decision was made independently of Dr. Dalthorp.

[6] We note the definitions are not inconsistent with the Court's ruling in Jennings that a telephone conversation between a non-treating physician and the treating physician concerning the patient, without more, is insufficient to establish a physician-patient relationship.

 

 

 

FISCHER, V.C.J., dissenting:

¶1 The Majority affirms the judgment in favor of Dr. Dalthorp and her employer Red Rock in this summary proceeding. I respectfully dissent for two reasons. First, the inferences reasonably drawn from the undisputed facts show that Dalthorp formed a physician-patient relationship before she decided that Christopher Cooper did not need treatment for his mental condition. Then, based on diagnosis, Dalthorp refused the Durant hospital's request to have Cooper transferred to Red Rock's mental health crisis unit. Second, Dalthorp did not show that as a matter of law she only provided medical services for her employer, Red Rock. Consequently, she did not eliminate the critical theory of liability argued by Cooper -- Dalthorp was contractually obligated to provide medical services to Cooper. Consequently, Dalthorp's motion was not "well taken," and should not have been granted. Spirgis v. Circle K Stores, Inc., 1987 OK CIV APP 45, ¶ 9, 743 P.2d 682 (approved for publication by the Oklahoma Supreme Court).

¶2 In her motion for summary judgment, Dalthorp argued that she was not liable for Cooper's death or the damages attendant to that occurrence because she did not owe Cooper a duty. The existence of a psychiatrist's duty in these situations has been addressed by our Supreme Court in Wofford v. Eastern State Hosp., 1990 OK 77, 795 P.2d 516. The Court followed the Restatement (Second) of Torts § 315 approach in basing a duty on the existence of a special relationship finding that a psychotherapist/patient relationship is a sufficient basis for imposing a duty. Id. ¶ 9.

Whenever a person is placed in such a position with regard to another that it is obvious that if he did not use due care in his own conduct he will cause injury to the other, the duty at once arises to exercise care commensurate with the situation in order to avoid such injury.

Id. ¶ 10. Wofford focused on the foreseeability of the harm caused by a former mental patient two years after his release.

¶3 Dalthorp's motion does not address the foreseeability aspect of the duty issue. Dalthorp argued that Oklahoma law requires the existence of a physician-patient relationship before a duty will be imposed, citing Jennings v. Badgett, 2010 OK 7, ¶ 17, 230 P.3d 861 (holding that "the element of duty in a medical malpractice action requires a physician-patient relationship"). Dalthorp then claimed that "there is simply no evidence which would establish that a physician-patient relationship existed between Cooper and Dr. Dalthorp." That is the sole issue raised by Dalthorp's motion.[1] In my view, even a cursory review of the record refutes that claim.

¶4 According to her statement of undisputed facts, Dalthorp was a contract physician for Red Rock, providing "call coverage" for Red Rock's Crisis Stabilization Unit in Norman, when she received a request for a consultation regarding a patient (Cooper) being held at Alliance's hospital in Durant. Hospital personnel called Red Rock triage at approximately 7 p.m. and requested that Cooper be admitted to Red Rock's mental health crisis facility. At approximately 11:15 p.m. on July 2, 2015, Dalthorp returned the call from her home and talked to P.A. Thomann. Thomann told Dalthorp that Cooper had been taken to the hospital by police because he made suicidal statements and was experiencing auditory hallucinations and agitation. After a four-minute conversation with Thomann, Dalthorp decided that Cooper's symptoms were caused by methamphetamine-induced psychosis. Because Cooper's symptoms were identical to those of a schizophrenic, Dalthorp told Thomann that Cooper needed to "sober up" before it could be determined if he was schizophrenic. Dalthorp did not authorize Cooper's admission to Red Rock's Crisis Stabilization Unit and declined the request to have him transferred. Cooper was discharged from the Durant hospital approximately thirty minutes after the Dalthorp/Thomann consultation ended. Cooper's course of erratic behavior continued, resulting in his death.

¶5 Dalthorp argued that no physician-patient relationship was formed because she did not permit Cooper to be transferred and admitted to Red Rock. Based on that argument, she maintained that she did not "agree" to accept Cooper as a patient. Brisco argued that the physician-patient relationship was formed before Dalthorp declined the transfer request because Dalthorp diagnosed Cooper as suffering from methamphetamine-induced intoxication. The issue of whether a physician-patient relationship exists is not, as Dalthorp argued, "a question of law for a court to decide." (Dalthorp Motion, p. 10) (emphasis in original). The formation of a physician-patient relationship is a question of fact. Jennings v. Badgett, 2010 OK 7, ¶ 18.

¶6 As material to Dalthorp's motion for summary judgment, what she was told and her actions during her four-minute call with Thomann were not disputed. (See Part II, infra). The inferences to be drawn from those actions remain disputed.

When uncontroverted proof lends support to conflicting inferences, the choice to be made between the opposite alternatives does not present an issue of law but rather one for the trier of fact. Even when basic facts are undisputed, motions for summary judgment should be denied if, under the evidence, reasonable persons might reach different inferences or conclusions from the undisputed facts.

Payne v. Kerns, 2020 OK 31, ¶ 10, 467 P.3d 659 (citations omitted). On the basis of this record, Dalthorp failed to establish the absence of a physician-patient relationship as a matter of law and is not entitled to summary judgment.

I. Dr. Dalthorp's "Facts"

¶7 Dalthorp centered her argument on Fact No. 19 in her motion for summary judgment: "Dr. Dalthorp never agreed to enter into a physician-patient relationship with Cooper." Whether Dalthorp "agreed" to enter into a physician-patient relationship is only one fact to be considered when determining whether that relationship was formed. As framed in Jennings, 2010 OK 7, ¶ 13, the issue is whether the physician consented to provide "professional services." Those professional services include the diagnosis and/or treatment of "any illness, condition or disability. . . ." Okla. Admin. Code § 435:10-1-4 (2014) (initially adopted in 2011 after Jennings was decided).[2]

 

¶8 Dalthorp did not rely on her own testimony to resolve this question of fact, perhaps because her testimony on the issue is conflicting.[3] The only evidence cited to support Fact No. 19 is page 103, lines 20-24 of P.A. Thomann's deposition:

 

Q. (By Mr. Henderickson) She never used the words "I'm agreeing to take on Mr. Cooper as a patient? I'm agreeing to enter a relationship with him"?
She never said anything like that; correct?
A. That is correct.

Dalthrop's Fact No. 19 is a serious misrepresentation of Thomann's testimony.

¶9 The complete exchange on this issue begins on the previous page of Thomann's deposition, as follows:

Q. Okay to your knowledge, based on your conversation with [Dr. Dalthorp], she did not agree to enter into a physician-patient relationship with Mr. Cooper; correct?
A. She was consulted.
Q. Right. But she never communicated to you that she was agreeing to enter into a physician-patient relationship with Mr. Cooper; correct?
A. I don't understand the definition of that.
Q. Okay.
A. Sorry.
Q. That's okay.
Do you know what a physician-patient relationship is or what the criteria are for determining whether one exists or not?
A. No, I do not.
Q. Okay. Let me put it this way. Apart from whatever advice that Dr. Dalthorp may have given to you, she did not in any form or fashion agree to enter into a physician-patient relationship with Mr. Cooper; correct?
Ms. Buchan: Object to the form as asked and answered. She has said that she doesn't know the legality of that.
Mr. Henderickson: Fair enough.
Q. (By Mr. Henderickson) She never used the words "I'm agreeing to take on Mr. Cooper as a patient? I'm agreeing to enter a relationship with him"?
She never said anything like that; correct?
A. That is correct.

(Thomann depo. pp. 102-103, lines 22 through 24).

¶10 First, the quoted exchange indicates Thomann's reluctance to testify that Cooper was not Dalthorp's patient. Second, Thomann's testimony that Dalthorp did not use the exact words "I'm agreeing to enter a physician-patient relationship," is not equivalent to an affirmative statement that Dalthorp did not agree to have a physician-patient relationship with Cooper.

¶11 Of greater concern is the fact that on page 6 of her Reply to Brisco's summary judgment response, Dalthorp quoted at length from Thomann's testimony (including page 103, lines 20-24), but omitted critical testimony. Thomann testified that she did not "understand the definition of" the term physician-patient relationship. To paraphrase Dalthorp's argument in her summary judgment Reply, Dalthorp "cannot simply choose a different part of the deposition where a less detailed version" of the evidence is discussed. (Dalthorp Reply, p. 13). Because Thomann did not know what a physician-patient relationship was, her testimony that Dalthorp "never used the words" physician-patient relationship completely failed to establish the absence of a physician-patient relationship, which was the "fact" Thomann's testimony was cited to establish.

II. Undisputed Facts

¶12 In my view, the physician-patient relationship issue is not resolved by the fact that Dalthorp eventually decided not to admit Cooper or permit his transfer to Red Rock. Dalthorp's actions before that moment are determinative. The following facts determine the existence of a physician-patient relationship.

1. Dalthorp was an independent physician who entered into a contract to provided services for Red Rock. (Dalthorp MSJ, Fact 1).
2. As a contract physician for Red Rock, her duties included taking calls, going to the hospital to evaluate and admit patients and responding "to issues on the unit" if nurses had questions or needed medication ordered. (Dalthorp 2018 depo. p. 22).
3. As part of her contractual duties, she was required to respond to the request for a "doc-to-doc" consultation from the Durant hospital where Cooper was being held. (Dalthorp MSJ, Facts 1-6, Dalthorp 2018 depo. pp. 22, 86; Dalthorp 2019 depo. p. 84).
4. Pursuant to her contract with Red Rock, Dalthorp could not have refused to return the call from the Durant hospital. "I wouldn't do that. It would be unprofessional." (Dalthorp 2018 depo. pp. 118-19).
5. When she returned the call from the Durant hospital, she "assumed that [Cooper] was displaying symptoms that would warrant admission to the hospital . . . ." (Dalthorp 2018 depo. p. 67).
6. When she called the Durant hospital, Dalthorp talked to Thomann in order to "evaluate in my [Dalthorp's] mind whether Mr. Cooper was appropriate for transfer." (Dalthorp MSJ, Fact 6; Dalthorp 2018 depo. p. 86).
7. After talking to Thomann for less than four minutes, Dalthorp made the "judgment" that "methamphetamine intoxication was the cause of his symptoms." (Dalthorp 2018 depo. p. 61)(see also Dalthorp answer to Interrogatory 6, Exhibit 2 to Dalthorp MSJ).
8. Dalthorp was exercising her "professional skill and judgment" as a physician in the performance of her contractual duties when she made the "judgment" that Cooper was not appropriate for transfer to Red Rock because he was suffering from methamphetamine intoxication. (Dalthorp 2018 depo. pp. 61, 119-20).
9. Red Rock accepts patients exhibiting psychosis resulting from drug-induced intoxication. (Dalthorp 2018 depo. p. 67).
10. Dalthorp did not dispute the fact that Cooper's symptoms were within the criteria for acceptance to Red Rock. (Dalthorp 2018 depo. p. 68).
11. Dalthorp also testified that Cooper's symptoms were identical to those of a schizophrenic, but she could not differentiate between the two based on her conclusion that Cooper was intoxicated on methamphetamine until he had time to "sober up." (Dalthorp MSJ, Fact 10; Dalthorp 2018 depo. p. 53).
12. Dalthorp did not testify that she declined to accept Cooper's transfer because he failed to meet Red Rock's admission criteria. (see Record on Appeal).[4]
13. Dalthorp testified that she declined the Durant hospital's request for Cooper's transfer because she "did not believe that it was in the best interest of Mr. Cooper to be transported, handcuffed in the back of a police car, for two and a half to three hours." (Dalthorp 2018 depo. p. 68; Dalthorp answer to Interrogatory 6, Exhibit 2 to Dalthorp MSJ).
14. Dalthorp testified that she "felt it was in Mr. Cooper's best interest to be observed and re-evaluated to see if he, indeed, needed admission to the psychiatric hospital." (Dalthorp 2018 depo. p. 68).
15. Dalthorp recommended to Thomann that Cooper be allowed to sober up and then be re-evaluated "for self harm/psychosis. . . ." (Dalthorp answer to Interrogatory 6, Exhibit 2 to Dalthorp MSJ).
16. Dalthorp testified that the Durant hospital "could have certainly called back the next day and asked if we had a bed available . . . ." (Dalthorp 2018 depo. pp. 70-71).
17. Dalthorp also testified that when she decided not to accept the request for Cooper's transfer she was observing her Hippocratic Oath as a physician to "'do no harm,' we want to do what's best for the patient, and inpatient admission isn't always what's best for the patient." (Dalthorp 2018 depo. p. 74; Dalthorp 2019 depo. p. 22).
18. Dalthorp was concerned that if Cooper was only intoxicated and later no longer psychotic he might have "lost his job or had some other significant circumstance" if she had admitted him to Red Rock's inpatient unit. (Dalthorp 2018 depo. p. 74).

III. The Physician/Patient Relationship

¶13 Under different circumstances, Dalthorp's refusal to accept Cooper's transfer might, in and of itself, establish the absence of a physician-patient relationship. For example, if Dalthorp called Thomann and had been told that Cooper's only symptoms were a fever and complaints of a sore throat, Dalthorp's refusal to admit Cooper to a psychiatric hospital likely would not establish that she entered into a physician-patient relationship with him. Or, if the purpose of Dalthorp's call was limited to informing Thomann that Red Rock had no open bed available for Cooper, then no physician-patient relationship would have been established. "[A] physician is not under a general duty to provide professional services to others . . . ." Jennings v. Badgett, 2010 OK 7, ¶ 13, 230 P.3d 861.

¶14 But, in this case, the purpose of Dalthorp's call was to evaluate whether Cooper was appropriate for transfer. (See Part II, no. 6, supra). Dalthorp testified that during the call, she exercised her medical judgment and diagnosed Cooper's condition as intoxicated from methamphetamine rather than schizophrenic. Based on that diagnosis, she decided the best treatment for him was a re-evaluation after time to "sober up." Dalthorp decided that being handcuffed and transported for three hours in his intoxicated state was not good treatment for Cooper and, because she diagnosed Cooper as intoxicated, she performed her duty as a physician to "do no harm" to the "patient." She expressed concern for the stigma and consequences that might result from an unnecessary commitment to a psychiatric hospital. (See Part II, nos. 6-18, supra).

¶15 As Brisco correctly pointed out, the Oklahoma Board of Medical Licensure and Supervision promulgated a rule defining the physician-patient relationship in 2011, approximately one year after Jennings was decided. According to the agency responsible for governing the practice of medicine in Oklahoma, a physician-patient relationship is "established when a physician agrees by direct or indirect contact with a patient to diagnose or treat any illness, condition or disability. . . ." Okla. Admin. Code § 435:10-1-4 (emphasis added). Dalthorp's contract with Red Rock post-dates the Board of Medical Licensure's 2011 Rule. Consequently, that Rule was incorporated into and constituted a term of Dalthorp's contract with Red Rock as a matter of law. "[A] part of every contract in this state is the law applicable to that contract." Brown v. Patel, 2007 OK 16, ¶ 10, 157 P.3d 117. Therefore, Dalthorp established a physician-patient relationship with Cooper, as a matter of law, if she diagnosed or treated him.

A. Evidence Dr. Dalthorp Diagnosed Cooper

¶16 In her carefully worded summary judgment motion, Dalthorp argued that there was no physician-patient relationship because she did not agree to allow Cooper to be transferred to Red Rock and, therefore, never "agreed to treat" Cooper. Noticeably absent from Dalthorp's motion is any discussion of whether Dalthorp "diagnosed" Cooper, and formed a physician-patient relationship as a result. To diagnose is: "to recognize (as a disease) by signs and symptoms."[5]

 

¶17 Based on the facts in this record, it reasonably can be inferred that Dalthorp's medical "judgment" that Cooper was suffering from methamphetamine-induced intoxication rather than schizophrenia constituted a "diagnosis." Brisco is entitled to that inference. "We view the facts and all reasonable inferences arising therefrom in the light most favorable to the non-moving party." Payne v. Kerns, 2020 OK 31, ¶ 10, 467 P.3d 659. As a matter of law, that diagnosis would constitute the practice of medicine. See 59 O.S.2011 § 492(C)(3)(a) (stating that "the practice of medicine and surgery shall include . . . any offer or attempt . . .to . . . diagnose . . . any . . . mental condition of any person").

 

¶18 According to the Oklahoma Legislature, the practice of medicine also includes:

performance by a person . . . through an ongoing regular arrangement, of diagnostic or treatment services . . . through electronic communications for any patient whose condition is being diagnosed or treated within this state by a physician duly licensed and practicing in this state. A person who performs any of the functions covered by this subparagraph submits himself or herself to the jurisdiction of the courts of this state for the purposes of any cause of action resulting from the functions performed.

59 O.S.2011 § 492(C)(3)(b). There is evidence in this record of an "ongoing regular arrangement, of diagnostic or treatment services" between Red Rock and the Durant hospital. Mija Stowe, Cooper's case manager, testified that it was her responsibility to find a bed in a mental health facility where Cooper could be transferred (Stowe depo. p. 48), and that she had a list of facilities to choose from. (Stowe depo. p. 52). However, at that time it was her practice to call Red Rock. (Stowe depo. p. 49). Stowe testified that in those circumstances she would contact Red Rock by phone. She also testified that it was her practice to send patient records to Red Rock when she requested the transfer. (Stowe depo. p. 52)

¶19 Dalthorp agreed that she was practicing medicine on the night of July 2, 2015, when she called Thomann. (See Part II, no. 8, supra). Whether Dalthorp's diagnosis was correct or negligent is irrelevant in determining the existence of a physician-patient relationship. Nonetheless, it appears from this record that Dalthorp would have diagnosed Cooper as schizophrenic but for her misunderstanding that Cooper had taken methamphetamine. A diagnosis of schizophrenia would have warranted Cooper's immediate transfer to Red Rock. If Dalthorp had accepted the transfer request, her contract with Red Rock would have required her to meet Cooper at the Norman Crisis Unit at approximately two o'clock in the morning on July 3, 2015, a holiday, to supervise his admission. (Dalthorp 2018 depo. p. 75). Without question, Cooper would have been her patient in those circumstances.

¶20 Nonetheless, Dalthorp argued that there was no physician-patient relationship because she did not agree to Cooper's transfer and, therefore, did not meet with, speak to or have any direct contact with Cooper. (See Fact No. 20 in Dalthorp's MSJ). Those facts are relevant, but not determinative. If Dalthorp was not Cooper's treating physician, "we turn to other indicia of a physician-patient relationship." Jennings v. Badgett, 2010 OK 7, ¶ 19, 230 P.3d 861. For example, "a physician's agreement with a hospital might require an on-call physician to treat the hospital's patients. . . ." St. John v. Pope, 901 S.W.2d 420, 424 (Tex. 1995) (noted in Jennings, 2010 OK 7, ¶¶ 23-24, along with cases from other jurisdictions, for evidence establishing a physician-patient relationship).

¶21 Ultimately, it does not matter whether Dalthorp had direct contact with Cooper. See Sanders v. Cole, 2019 OK CIV APP 71, ¶ 33, 454 P.3d 761, cert. denied October 28, 2019 (all justices concurring). The diagnosis sufficient to form a physician-patient relationship can result from "indirect" contact. Okla. Admin. Code § 435:10-1-4. "Creation of the physician-patient relationship does not require the formalities of a contract. The fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician-patient relationship." Pope, 901 S.W.2d at 424 (emphasis added).

¶22 In order to obtain summary judgment, Dalthorp was required to establish that she did not diagnose Cooper. She did not establish that fact, which was material to her motion. "A fact is 'material' if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." Hadnot v. Shaw, 1992 OK 21, ¶ 18, 826 P.2d 978 (footnote omitted). In fact, Dalthorp's motion did not address that issue. And, in her Reply to Brisco's summary judgment response, Dalthorp only asserted that she did not "agree" to diagnose or treat Cooper. Dalthorp did not support that assertion with any citation to supporting evidence in the record. Whether she did or did not agree to diagnose or treat Cooper is not dispositive; her actions are dispositive. The appellate court has "an affirmative duty to test all evidentiary material tendered in summary process for its legal sufficiency to support the relief sought by the movant." Copeland v. The Lodge Enters., Inc., 2000 OK 36, ¶ 8, 4 P.3d 695. There is sufficient evidence in this record from which a jury could reasonably conclude that Dalthorp diagnosed Cooper on the night of July 2, 2015.

B. Evidence Dr. Dalthorp Treated Cooper

¶23 In addition, there is evidence in this record from which a jury could conclude that Dalthorp participated in developing a treatment plan for Cooper. Because "you can't differentiate between meth intoxication and schizophrenia until the substance is no longer in a patient's system," Dalthorp "recommended [to P.A. Thomann] that [Cooper] be allowed to sober up and be re-evaluated for self harm/psychosis as symptoms often remit when no longer intoxicated." Dalthorp believed "it was in Mr. Cooper's best interest to be observed and re-evaluated to see if he, indeed, needed admission to the psychiatric hospital." That was the reason Dalthorp advised Thomann at the end of their telephone consultation that Cooper needed to "sober up and be re-evaluated." (See Part II, nos. 11-18, supra).

¶24 Finally, as Dalthorp testified, her Hippocratic Oath as a physician required her to "do no harm." In that spirit, and based on her diagnosis of methamphetamine-induced intoxication, Dalthorp decided that "the transport of a stimulant intoxicated patient, handcuffed in the back of a police car for the nearly 3-hour commute to Red Rock was not in the patient's best interest." Dalthorp made that decision even though, according to her testimony, Red Rock accepts patients who exhibit psychosis related to drug intoxication. (See Part II, nos.11-18, supra). "[W]e want to do what's best for the patient, and inpatient admission isn't always what's best for the patient." (Dalthorp 2018 depo. p. 74; Dalthorp 2019 depo. p. 22). In my view, it is for a jury to decide whether Dalthorp "treated" or participated in the "treatment" of Cooper.

IV. Jennings v. Badgett

¶25 The current practice of medicine depends on access to specialists, like Dalthorp, who never physically encounter the person with whom they undeniably have a physician-patient relationship. See, e.g., Roth v. Mercy Health Ctr., Inc., 2011 OK 2, ¶ 10, 246 P.3d. 1079 (where the orders and medical opinions of two private practice cardiologists, consulted by the hospital's physician, were used in treating a patient and allegedly contributed to her death). "[L]iability for negligent breach of a contract with a third party is not necessarily dependent upon a pre-existing privity in legal relationship between the person injured and the person causing the injury." Keel v. Titan Constr. Corp., 1981 OK 148, ¶ 14, 639 P.2d 1228. The dicta in Jennings recognizes the rule announced in Keel. "By finding the element of duty in a medical malpractice action requires a physician-patient relationship, we are not disallowing a cause of action for medical malpractice by a third-party beneficiary . . . ." Jennings, 2010 OK 7, ¶ 17.

¶26 The Majority would limit this legal theory to cases involving a parent and child, which was the situation in Jennings. See Majority Opinion at n.21. That limitation is not in the dicta from Jennings; rather, it was one example of a third-party beneficiary contract noted by the Jennings Court: "[We] are not disallowing a cause of action for medical malpractice by a third-party beneficiary, such as a child, based on negligent prenatal care or a negligent delivery." Id. ¶ 17 (emphasis added).

¶27 Brisco relied on the third-party beneficiary theory of liability in her response to Dalthorp's motion for summary judgment. She did not use the words, "third-party beneficiary" but consistently argued that Dalthorp's duty to Cooper was derived from Dalthorp's contract with Red Rock to provide medical services, including her diagnosis of Cooper. See Brisco Response, pp. 17-20.[6] Nonetheless, the Majority declines to address this issue because: "Plaintiff never argued that Cooper was a third-party beneficiary of Dr. Dalthorp's contract with Red Rock." Even if that were the case, or if Brisco had not filed any response, Dalthorp was not entitled to judgment unless she addressed all theories of potential liability. Oklahoma's summary judgment jurisprudence requires examination of the motion's merits: "[I]f the motion for summary judgment is not well-taken, [even] the failure of the opposing party to respond does not mean that the motion must be granted by the court." Spirgis v. Circle K Stores, Inc., 1987 OK CIV APP 45, ¶ 9, 743 P.2d 682 (approved for publication by the Oklahoma Supreme Court). "When rendering summary judgment . . . the [district] court was not only authorized but required to rule out all theories of liability fairly comprised within the evidentiary materials before [it]." Hadnot v. Shaw, 1992 OK 25, ¶ 18, 826 P.2d 978.

¶28 As the Majority views the record, Brisco admitted that Dalthorp did not form a physician-patient relationship with Cooper. Brisco's summary judgment submissions contain no such admission and even Dalthorp did not make that argument. (See Dalthorp Reply to Brisco's Response, pp. 11-12). Dalthorp only took issue with Brisco's response to Fact Nos. 1-4, 6, 7, 20 and 22. Dalthorp did not challenge Brisco's denial of Fact No. 19. Brisco "denied" Fact No. 19, "as worded." She supported her denial by referring to her response to Fact Nos.1 through 4 of Dalthorp's motion. Her response showed that "the purpose of the consultation call between Dalthorp and Thomann was to evaluate Cooper for admission to Red Rock" and that Dalthorp was required to perform those medical services pursuant to her contract with Red Rock, as well as applicable statutes.

¶29 The facts in this case are materially different from those in Jennings. Jennings held that an informal telephone conversation with the treating physician, "without more," was "insufficient" to establish a physician-patient relationship. Jennings, 2010 OK 7, ¶ 27. Here, it is undisputed that Dalthorp was required by contract to participate in the telephone call. Further, Jennings addressed "whether a physician-patient relationship exists when the physician has not examined, diagnosed, or treated the patient." Id. ¶ 19. There are material facts in this record, although disputed by Dalthorp, from which a jury could conclude that Dalthorp diagnosed and/or treated Cooper. Consequently, Jennings is not dispositive of the physician-patient issue in this case.

¶30 In addition, Jennings was decided in early 2010, before the Board of Medical Licensure adopted the rule defining a physician-patient relationship. Jennings has not been cited in an Oklahoma published appellate court opinion for its discussion of the physician-patient relationship in the twelve years since it was decided, and the implications of the Board's 2015 rule have not been addressed by the Supreme Court. The practice of medicine has changed during that time. The physician-patient contract required by Jennings for a malpractice claim is less frequently manifested by in-person contact between the physician and the patient. "Creation of the physician-patient relationship does not require the formalities of a contract. The fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician-patient relationship." St. John v. Pope, 901 S.W.2d 420, 424 (Tex. 1995) (noted in Jennings, 2010 OK 7, ¶¶ 23-24).

¶31 With respect to other contracts, "the existence and terms of [a contract can be] manifested by conduct." 15 O.S.2011 § 133. There is nothing in Jennings suggesting that the rules of construction applicable to all other contracts would not be applied in determining the existence of a physician-patient relationship. Consequently, it is Dalthorp's entire course of conduct, not just her refusal to admit Cooper, that is determinative.

¶32 In essence, Dalthorp argued that a physician who negligently diagnoses a patient and concludes that the patient does not need treatment, or that appropriate treatment should be deferred, can avoid liability for injuries resulting from that negligence. According to Dalthorp, a physician can avoid liability by claiming there was no physician-patient relationship because, at some later point, the physician did not formally "agree" to accept the patient. In my view, Jennings does not require that result.

¶33 Dalthorp's ultimate liability in this case depends on the resolution of several issues, such as foreseeability, proximate cause and intervening cause. Dalthorp may prevail on those issues. The Majority concludes that, ultimately, Dalthorp will prevail because she did not recommend Cooper's discharge from the Durant Hospital. (Majority Opinion at n.30). Ultimately, it may be that any negligence by Dalthorp was not the proximate cause of Cooper's death. But that was not the basis for Dalthorp's motion or the district court's decision.

¶34 Nonetheless, as the Majority appears to do, this Court may affirm a decision on a different legal theory than the one relied on by the district court. Jacobs Ranch, L.L.C. v. Smith, 2006 OK 34, ¶ 58, 148 P.3d 842. In my view, the use of that principle is inappropriate in a summary judgment proceeding where the moving party did not raise the issue and the party opposing the motion was not given the opportunity to respond to or brief the issue. If, as the Majority assumes, Dalthorp owed a duty to Cooper and breached that duty, "whether the injuries flowing from the original negligence could have been foreseen is a question within the realm of fact and not law." Fargo v. Hays-Kuehn, 2015 OK 56, ¶ 18, 352 P.3d 1223.[7] Whether a defendant's conduct was a "condition" or the proximate cause of the plaintiff's injuries is a question for the jury to decide. Dirickson v. Mings, 1996 OK 2, ¶ 9, 910 P.2d 1015.

¶35 The only issue Dalthorp asked the district court to decide was whether she had a physician-patient relationship with Cooper. Based on the single issue raised in Dalthorp's motion, this record fails to establish as a matter of law that Dalthorp did not have that physician-patient relationship. I would reverse the summary judgment in favor of Dalthorp and Red Rock, and therefore, respectfully dissent.

 

FOOTNOTES

[1] Dalthorp also included an affidavit from a fellow psychiatrist stating his opinion that "Dr. Dalthorp acted reasonably and appropriately under the circumstances." That affidavit does not address the applicable standard of care nor does it establish as a matter of law that Dalthorp is not liable for the care she rendered in diagnosing and treating Cooper. Consequently, Brisco was not required to respond to this issue. "[A] response is not necessary to challenge material facts which are not supported by admissible evidence." Spirgis v. Circle K Stores, Inc., 1987 OK CIV APP 45, ¶ 9, 743 P.2d 682 (approved for publication by the Oklahoma Supreme Court). Consequently, the standard-of-care issue cannot be resolved by summary judgment on the basis of this record.

[2] Fact No. 20 in Dalthorp's motion added legal conclusions about certain actions and additional facts, including that Dalthorp did not allow Cooper to be transferred, that Dalthorp did not talk to, personally examine, personally consult with, personally provide medical advice to Cooper or "charge the patient . . . for professional services." Some of those facts were not disputed and are relevant to determining the fact issue of whether a physician-patient relationship existed. But those facts are not determinative of whether Dalthorp consented to provide "professional services." Further, Brisco denied Fact 20 to the extent that it purportedly established the absence of a physician-patient relationship. Brisco cited Dalthorp's testimony and legal authorities to establish the existence of that relationship by virtue of Dalthorp's contract with Red Rock and the services, Brisco argued, Dalthorp performed for Cooper pursuant to that contract.

[3] It appears, at least for some period of time, that Dalthorp referred to Cooper as her "patient." She testified that when she called Thomann, she was "doing [her] job, screening to see if this patient was appropriate to be transferred to Red Rock." (Dalthorp 2019 depo. p. 84). She did not permit Cooper's transfer because "the transport of an intoxicated patient, handcuffed in the back of a police car for the nearly 3 hour commute to Redrock [sic] was not in the patient's best interest." (Dalthorp answer to Interrogatory 6, Ex. 2 to Dalthorp's motion; Dalthorp 2018 depo. p. 68). Dalthorp did not authorize Cooper's transfer because, "in the spirit of [her Hippocratic Oath as a physician to] 'do no harm,' we want to do what's best for the patient, and inpatient admission isn't always best for the patient." (Dalthorp 2018 depo. p. 74). Elsewhere, Dalthorp testified: "He was not my patient." (Dalthorp 2018 depo. p. 75).

[4] Thomann testified that, during their phone conversation, Dalthorp declined the transfer requested by "mental health" at the hospital "based off the information provided, that he did not meet criteria for inpatient evaluation. It sounded like meth-induced psychosis, and that he needed to sober up." (Thomann depo. p. 69). Thomann testified it was her "understanding" that Dalthorp declined the transfer because Cooper did not meet "criteria." When asked if she knew what criteria Cooper failed to meet, she testified: "You would have to ask Dr. Dalthorp." (Thomann depo. pp. 74-75). Dalthorp never used the words "criteria" or "admission criteria" in her deposition or to explain the reason she chose not to admit Cooper to Red Rock.

[5] "Diagnose," Merriam-Webster.com Dictionary, Merriam-Webster, http://www.merriam-webster.com/dictionary/diagnose (last visited Feb. 28, 2022).

[6] "Dalthorp was under contract with Red Rock to provide medical services." "Dalthorp's contract required her to take calls to evaluate patients for admission to Red Rock." "Dalthorp was . . . under a contractual duty with Red Rock to participate in the consultation phone call with Thomann." "Dalthorp concedes she was exercising medical judgment as to what was in the []patient's [Cooper's] best interest."

[7] This issue may be decided as a matter of law, "only when there is no evidence from which a jury could reasonably find a causal nexus between the act and the injury." Fargo v. Hays-Kuehn, 2015 OK 56, ¶ 16, 352 P.3d 1223. Here, there is undisputed evidence from which a jury could conclude that Dalthorp's diagnosis of Cooper factored into Thomann's decision to discharge Cooper. Thomann testified that on the evening of July 2, 2015, she was waiting on a call from a psychiatrist at Red Rock because Mental Health had requested a consultation from a Red Rock physician (Thomann depo. pp. 62-63); when Dalthorp called, Thomann introduced herself as "a physician assistant caring for Mr. Cooper" (Thomann depo. p. 68); Thomann explained that Cooper had been brought in by police for "evaluation for suicidal ideation" (Thomann depo. p. 73); Thomann consulted Dalthorp to co-manage Cooper's care (pp. 102, 111); after Thomann described Cooper's symptoms, Dalthorp said "It sounded like meth-induced psychosis, and that he needed to sober up (Thomann depo. p. 69); Thomann based her decision to discharge Cooper on a number of factors, including her "interactions with Dr. Dalthorp and whatever opinions or advice [Dalthorp] gave to [her]." (pp. 104-05). Information provided by another physician and "used in treating" the patient may provide a basis for liability. Roth v. Mercy Health Ctr., Inc., 2011 OK 2, ¶ 10, 246 P.3d 1079.

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Civil Appeals Cases

 
Cite
Name
Level

 
1987 OK CIV APP 45, 743 P.2d 682, 58 OBJ 1702, 
Spirgis v. Circle K Stores, Inc.
Discussed at Length

 
2019 OK CIV APP 71, 454 P.3d 761, 
SANDERS v. COLE
Discussed

Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1990 OK 77, 795 P.2d 516, 61 OBJ 2093, 
Wofford v. Eastern State Hosp.
Discussed

 
1992 OK 21, 826 P.2d 978, 63 OBJ 442, 
Hadnot v. Shaw
Discussed at Length

 
1992 OK 25, 829 P.2d 959, 63 OBJ 529, 
Fulton v. Lane
Cited

 
1993 OK 155, 864 P.2d 839, 64 OBJ 3587, 
Jackson v. Mercy Health Center, Inc.
Discussed

 
1996 OK 2, 910 P.2d 1015, 67 OBJ 196, 
Dirickson v. Mings
Discussed

 
2006 OK 34, 148 P.3d 842, 
JACOBS RANCH, L.L.C. v. SMITH
Discussed

 
2007 OK 16, 157 P.3d 117, 
BROWN v. PATEL
Discussed

 
2007 OK 38, 160 P.3d 959, 
LOWERY v. ECHOSTAR SATELLITE CORP.
Discussed at Length

 
2010 OK 7, 230 P.3d 861, 
JENNINGS v. BADGETT
Discussed at Length

 
2011 OK 2, 246 P.3d 1079, 
ROTH v. MERCY HEALTH CENTER, INC.
Discussed at Length

 
2015 OK 56, 352 P.3d 1223, 
FARGO v. HAYS-KUEHN
Discussed at Length

 
2018 OK 35, 418 P.3d 698, 
LIND v. BARNES TAG AGENCY
Discussed

 
2020 OK 31, 467 P.3d 659, 
PAYNE v. KERNS
Discussed at Length

 
2000 OK 36, 4 P.3d 695, 71 OBJ 1172, 
Copeland v. The Lodge Enterprises, Inc.
Discussed

 
1981 OK 148, 639 P.2d 1228, 
Keel v. Titan Const. Corp.
Discussed

Title 15. Contracts

 
Cite
Name
Level

 
15 O.S. 133, 
Definition: Implied Contract
Cited

Title 59. Professions and Occupations

 
Cite
Name
Level

 
59 O.S. 492, 
Practice of Medicine and Surgery - Title - Hospital
Discussed

Title 43A. Mental Health

 
Cite
Name
Level

 
43A O.S. 5-206, 
Definitions
Cited

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA